

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL POSTAGE PREPAID, TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION ON THIS DATE.

DATED: 11-28-12

DEPUTY CLERK

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV 28 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

RONALD EUGENE LAIS,                    ) Case No. SACV 11-0420-JPR
                                       )
                    Petitioner,        )
                                       )
          vs.                          ) MEMORANDUM OPINION AND ORDER
                                       ) DENYING PETITION AND DISMISSING
KENNETH FORD, California               ) ACTION WITH PREJUDICE
Parole Region IV,                      )
                                       )
                    Respondent.        )
                                       )

## PROCEEDINGS

On March 15, 2011, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). On August 25, 2011, after four extensions of time, Respondent filed an Answer with an attached Memorandum of Points and Authorities, arguing, among other things, that the Petition was time barred. On April 27, 2012, after three extensions of time, Petitioner filed a "Traverse to Answer to Petition for Writ of Habeas Corpus; Request for Evidentiary Hearing, and Appointment

1

of Counsel" with an attached Memorandum of Points and
Authorities.  On July 20, 2012, the Court ordered Respondent to
lodge two additional state habeas petitions and the rulings on
them and file a supplemental brief addressing whether those
petitions resulted in statutory tolling of the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA") limitation period
sufficient to render the federal Petition timely.  On August 29,
2012, after one extension of time, Respondent lodged the
requested documents and filed a supplemental brief conceding that
the Petition was timely.  For the reasons discussed below, the
Court denies the Petition and dismisses this action with
prejudice.

**BACKGROUND**

Following a bench trial in Orange County Superior Court,
Petitioner was convicted on July 29, 2005, of 25 counts of
holding himself out as entitled to practice law after resigning
from the State Bar while facing disciplinary charges (Cal. Bus. &
Prof. Code § 6126(b)).  (Lodged Doc. 1, 4 Clerk's Tr. at 716-19;
Lodged Doc. 2, 4 Rep.'s Tr. at 683-84.)  The court found that
Petitioner was subject to a sentencing enhancement because he
committed nine of those offenses while released on his own
recognizance after being charged with another felony (Cal. Penal
Code § 12022.1).  (Lodged Doc. 2, 4 Rep.'s Tr. at 683-84.)  On
September 23, 2005, Petitioner was sentenced to 14 years in
prison.  (Id. at 756-57.)

Petitioner appealed, arguing that (1) the terms "practice
law" and "legal advice" in California Business and Professions
Code section 6126 were unconstitutionally vague and overbroad;

2

(2) section 6126 violated the equal protection clauses of the
federal and state constitutions; (3) his convictions on some
counts were duplicative of others; (4) the evidence was
insufficient to support some counts because it did not show that
Petitioner "held himself out" as entitled to practice law; (5)
some of the convictions violated ex post facto principles; (6)
giving advice on foreign law did not violate section 6126; (7)
the evidence was insufficient on some counts because there was no
testimony about them; and (8) Petitioner's sentences on some
counts violated California Penal Code section 654's proscription
against multiple punishments.  (Lodged Doc. 3.)  After retaining
new counsel, Petitioner filed a supplemental brief that adopted
the claims in the opening brief and further argued that
insufficient evidence supported some of his convictions because
the victims retained Petitioner as an expert consultant while
separately represented by an attorney.  (Id.)  On May 14, 2008,
the California Court of Appeal reversed Petitioner's convictions
on eight counts for lack of substantial evidence and directed the
trial court to resentence Petitioner.  (Lodged Doc. 5.)  The
court of appeal affirmed the judgment in all other respects.
(Id.)

Petitioner filed a Petition for Review in the California
Supreme Court, arguing that section 6126 was unconstitutionally
vague and overbroad.  (Lodged Doc. 6.)  On July 23, 2008, the
state supreme court summarily denied review.  (Lodged Doc. 7.)

On January 16, 2009, pursuant to the court of appeal's
order, the trial court dismissed Petitioner's convictions on the
eight counts and resentenced Petitioner to 12 years 8 months in

3

1   state prison.  (Lodged Doc. 8, 1 Clerk's Tr. at 298-99; Lodged

2   Doc. 9, 1 Rep.'s Tr. at 8-9.)  Petitioner appealed, arguing that

3   the trial court erred by resentencing him without first

4   addressing his request to appoint a new lawyer.  (Lodged Doc.

5   10.)  On December 21, 2009, the state court of appeal affirmed

6   the trial court's resentencing and directed it to prepare and

7   file an amended abstract of judgment.  (Id.)

8        Meanwhile, on May 8, 2009, Petitioner filed a habeas

9   petition in the state court of appeal, raising two grounds for

10  relief: judicial bias and ineffective assistance of counsel

11  ("IAC").  (Lodged Doc. 11.)  Specifically, Petitioner argued that

12  his trial counsel rendered ineffective assistance by failing to

13  (1) raise state and federal constitutional issues related to

14  regulation of the unauthorized practice of law; (2) employ or

15  call expert witnesses "to challenge [unlawful practice of law]

16  prosecutions and validate [his] business model"; (3) "file a

17  1538.5 motion[1] to challenge the complaint as promised"; (4)

18  cross-examine witnesses, challenge documents, or call any

19  witnesses; (5) present "DOJ/FTC data limiting [unlawful practice

20  of law] prosecutions"; (6) communicate a plea agreement; (7) warn

21  Petitioner of a "potential prison term"; (8) prepare for trial;

22  (9) "raise the issue of cruel and unusual punishment"; or (10)

23  "argue on [his] behalf on post-trial motions."  (Id.)  On May 19,

24  2009, the court of appeal summarily denied Petitioner's petition.

25  (Lodged Doc. 12.)

26  _____

27       [1]   California Penal Code section 1538.5 states that in
     certain circumstances a defendant may file a motion to suppress
28   evidence obtained as the result of a search or seizure.

1   On June 9, 2009, Petitioner filed a habeas petition in the
2   state superior court, raising the same judicial-bias and IAC
3   claims.  (Lodged Doc. 13.)  On June 23, 2009, the superior court
4   denied the petition on three "separate and independent" grounds:
5   (1) Petitioner was convicted in 2005 but failed to explain or
6   justify his delay in bringing the claims "insofar as Petitioner
7   complains about the representation prior to his conviction and
8   during his court trial"; (2) he failed to plead sufficient
9   grounds for relief; and (3) he failed to show that his trial
10  counsel's performance was deficient or that it resulted in
11  prejudice.  (Lodged Doc. 14.)

12  On October 14, 2009, Petitioner filed another habeas
13  petition in the state court of appeal, raising the same judicial-
14  bias and IAC claims.  (Lodged Doc. 15.)  On October 29, 2009, the
15  state court of appeal summarily denied the petition.  (Lodged
16  Doc. 16.)  On December 18, 2009, Petitioner filed a habeas
17  petition in the California Supreme Court, again raising the same
18  judicial-bias and IAC claims.  (Lodged Doc. 17.)

19  On February 3, 2010, Petitioner filed a habeas petition in
20  the state superior court, raising two claims for relief.  (Lodged
21  Doc. 18.)  First, Petitioner argued that his trial counsel had
22  rendered ineffective assistance by "fail[ing] to raise defense of
23  cruel and unusual punishment as instructed by [P]etitioner" or
24  "argue for leniency based on trends in the law of 'unauthorized
25  practice of law.'"  (Id. at 3-3(a).)  Second, Petitioner argued,
26  for the first time, that his felony convictions and sentence for
27  violating section 6126(b) constituted cruel and unusual
28  punishment.  (Id. at 4.)

1   On March 10, 2010, the California Supreme Court summarily
2   denied the December 2009 habeas petition raising judicial bias
3   and IAC.   (Lodged Doc. 20.)   That same day, the state superior
4   court denied Petitioner's February 2010 habeas petition, which
5   raised IAC and cruel and unusual punishment, on the grounds that
6   it was untimely and successive, citing In re Clark, 5 Cal. 4th
7   750, 765, 797, 782, 21 Cal. Rptr. 2d 509, 518, 530, 540 (1993),
8   and In re Stankewitz, 40 Cal. 3d 391, 396 n.1, 220 Cal. Rptr.
9   382, 384 n.1 (1985).   (Lodged Doc. 19.)
10   On March 24, 2010, Petitioner filed a habeas petition in the
11   state superior court, arguing that he was entitled to additional
12   presentence conduct credits.   (Lodged Doc. 25 at 3.)   On April
13   28, 2010, Petitioner filed a habeas petition in the state court
14   of appeal, again arguing that (1) trial counsel rendered
15   ineffective assistance by "fail[ing] to raise the defense of
16   cruel and unusual punishment" or "argue for leniency based on
17   trends in the law of 'unauthorized practice of law'" and (2) his
18   felony convictions and sentence constituted cruel and unusual
19   punishment.   (Lodged Doc. 21 at 3-4.)   On April 13, 2010, the
20   superior court denied the sentencing-credits petition.   (Lodged
21   Doc. 26.)   On May 6, 2010, the court of appeal summarily denied
22   the petition alleging IAC and cruel and unusual punishment.
23   (Lodged Doc. 22.)
24   On June 21, 2010, Petitioner filed a habeas petition in the
25   court of appeal, again arguing that he was entitled to additional
26   presentence conduct credits.   (Lodged Doc. 27.)   On July 1, 2010,
27   Petitioner filed a final habeas petition in the California
28   Supreme Court, raising five grounds for relief: (1) the evidence

was insufficient to support his convictions because he "never advertised or held [himself] out as eligible to practice law in California when [he] was not"; (2) his conviction and sentence constituted cruel and unusual punishment; (3) section 6126(b) violated equal protection because "former California lawyers" were "singled out for harsher penalties . . . than their nonlawyer counterparts"; (4) his convictions constituted "Ex Post Facto application of law"; and (5) his trial and appellate counsel rendered ineffective assistance because they failed to raise the issues Petitioner was asserting in his petition. (Lodged Doc. 23 at 3-4, 4(a).)

On November 24, 2010, the state court of appeal granted Petitioner's petition seeking additional presentence conduct credits. (Lodged Doc. 28.) On January 26, 2011, the state supreme court summarily denied Petitioner's June 2010 petition. (Lodged Doc. 24.)

### PETITIONER'S CLAIMS

1. Petitioner's trial and appellate counsel were constitutionally ineffective.

      (A) Trial counsel was ineffective by failing to

           (i) investigate and prepare for trial,

           (ii) communicate a plea-bargain offer,

           (iii) follow instructions in trial and posttrial proceedings,

           (iv) return Petitioner's case file,

           (v) obtain replacement counsel,

           (vi) present evidence at trial, and

           (vii) object to improper evidence. (Pet. at

5.)

(B) Petitioner's appellate counsel was ineffective by failing to "raise all issues on appeal" and refusing to file habeas corpus petitions.  (Pet. at 5.)

2. Petitioner's sentence for unauthorized practice of law constituted cruel and unusual punishment.  (Pet. at 5.)

3. Insufficient evidence supported Petitioner's convictions for unlawful practice of law because "each alleged victim was represented by properly licensed counsel and signed an engagement agreement acknowledging [Petitioner's] role in their case as a qualified expert consultant."  (Pet. at 5-6.)

4. Petitioner's convictions violated equal protection because attorneys who are suspended, disbarred, or have resigned with charges pending "are treated more severely than laypersons who commit [unlawful practice of law] for no cogent reason." (Pet. at 6.)

5. Petitioner's convictions constitute an "Ex Post Facto application of law" because he was "prosecuted and convicted under [an] amended statute, which was not in effect at the time of the alleged offenses."  (Pet. at 6.)

6. Section 6126(b) was unconstitutionally vague and overbroad.  (Pet. at 6(a).)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by AEDPA:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings

8

1       unless the adjudication of the claim — (1) resulted in a

2       decision that was contrary to, or involved an

3       unreasonable application of, clearly established Federal

4       law, as determined by the Supreme Court of the United

5       States; or (2) resulted in a decision that was based on

6       an unreasonable determination of the facts in light of

7       the evidence presented in the State court proceeding.

8  Under AEDPA, the "clearly established Federal law" that controls

9  federal habeas review of state-court decisions consists of

10  holdings of Supreme Court cases "as of the time of the relevant

11  state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412,

12  120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

13      Although a particular state-court decision may be both

14  "contrary to" and "an unreasonable application of" controlling

15  Supreme Court law, the two phrases have distinct meanings. <u>Id.</u>

16  at 391, 413. A state-court decision is "contrary to" clearly

17  established federal law if it either applies a rule that

18  contradicts governing Supreme Court law or reaches a result that

19  differs from the result the Supreme Court reached on "materially

20  indistinguishable" facts. <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.

21  Ct. 362, 365, 154 L. Ed. 2d 263 (2002). A state court need not

22  cite or even be aware of the controlling Supreme Court cases, "so

23  long as neither the reasoning nor the result of the state-court

24  decision contradicts them." <u>Id.</u>

25      State-court decisions that are not "contrary to" Supreme

26  Court law may be set aside on federal habeas review only "if they

27  are not merely erroneous, but 'an <u>unreasonable</u> application' of

28  clearly established federal law, or based on 'an <u>unreasonable</u>

1  determination of the facts' (emphasis added)." Id. at 11. A
2  state-court decision that correctly identifies the governing
3  legal rule may be rejected if it unreasonably applies the rule to
4  the facts of a particular case. Williams, 529 U.S. at 406-08.
5  To obtain federal habeas relief for such an "unreasonable
6  application," however, a petitioner must show that the state
7  court's application of Supreme Court law is "objectively
8  unreasonable." Id. at 409-10. In other words, habeas relief is
9  warranted only if the state court's ruling is "so lacking in
10  justification that there was an error well understood and
11  comprehended in existing law beyond any possibility for
12  fairminded disagreement." Harrington v. Richter, 562 U.S. ___,
13  131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011).

14  Respondent asserts that ground one is procedurally
15  defaulted. (Answer Mem. P. & A. at 24-26.) For the reasons set
16  forth in the Discussion section below, the Court finds that only
17  one subclaim of ground one — that trial counsel was
18  constitutionally ineffective for failing to follow Petitioner's
19  "instructions" – is arguably procedurally defaulted. Because it
20  is easier to dispose of that subclaim on the merits, however, the
21  Court has not addressed Respondent's procedural-bar argument.
22  See Lambrix v. Singletary, 520 U.S. 518, 524-25, 117 S. Ct. 1517,
23  1523, 137 L. Ed. 2d 771 (1997); Franklin v. Johnson, 290 F.3d
24  1223, 1232 (9th Cir. 2002) (noting that federal courts "are
25  empowered to, and in some cases should, reach the merits of
26  habeas petitions if they are, on their face and without regard to
27  any facts that could be developed below, clearly not meritorious
28  despite an asserted procedural bar"); see also Smith v. Stewart,

1   407 F. App'x 237, 237-38 (9th Cir.) ("We need not address the

2   state's procedural default and exhaustion arguments because [the]

3   petition is clearly without merit."), cert. denied, 131 S. Ct.

4   2117 (2011).

5       Petitioner presented most of his subclaims of ground one —

6   that trial and appellate counsel were constitutionally

7   ineffective — to the state courts on habeas review.  On May 8,

8   2009, Petitioner filed a habeas petition in the state court of

9   appeal raising arguments that appear to correspond with four

10  subclaims of ground one: that trial counsel was ineffective by

11  failing to (1) investigate and prepare for trial; (2) communicate

12  a plea offer; (3) present evidence;[2] or (4) object to improper

13  evidence.[3]  (Lodged Doc. 11 at 3.)   The court of appeal summarily

14  denied those claims.  (Lodged Doc. 12.)   Petitioner raised the

15  same claims in a June 9, 2009 habeas petition filed in state

16  superior court (Lodged Doc. 13 at 3), which denied them on the

17  following "separate and independent grounds": (1) Petitioner

18  failed to explain or justify his delay in filing his petition;

19  (2) he failed to "plead sufficient grounds for relief"; and (3)

20  he failed to show that counsel's performance was deficient or

21  demonstrate any resulting prejudice  (Lodged Doc. 14).

22  Petitioner then raised the same subclaims in habeas petitions

23

---

24      [2]   Specifically, Petitioner alleged that trial counsel was
25  ineffective for failing to call any witnesses, call an expert
    witness, cross-examine witnesses, challenge documents, or present
26  "DOJ/FTC data limiting UPL prosecutions."  (Lodged Doc. 11 at 3.)

27      [3]   Specifically, Petitioner alleged that trial counsel was
    ineffective for failing to file a "1538.5 motion to challenge the
28  complaint as promised."  (Lodged Doc. 11 at 3.)

1  filed in the court of appeal and supreme court, which both

2  summarily denied them without citation to authority.  (Lodged

3  Docs. 15, 16, 17, 20.)   The Court looks through the silent

4  denials to the superior court's reasoned decision, see Delgadillo

5  v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008), and reviews it

6  under the deferential AEDPA standard because the superior court

7  reached the merits of the four subclaims in the alternative, even

8  though the court also rejected those claims on procedural

9  grounds, see James v. Ryan, 679 F.3d 780, 802 (9th Cir. 2012)

10 (holding that when state court primarily rejects habeas claim on

11 procedural ground but alternatively reaches and resolves merits

12 of claim, denial of it is entitled to AEDPA deference), pet. for

13 cert. filed, 81 U.S.L.W. 3047 (U.S. June 28, 2012) (No. 11A1119).

14      Petitioner raised one of his IAC subclaims — that appellate

15 counsel was ineffective in failing to raise various issues on

16 appeal — in a habeas petition filed in the state supreme court.

17 (Lodged Doc. 23 at 4(a).)   The supreme court summarily denied the

18 petition without citation to authority (Lodged Doc. 24), which is

19 presumed to be an adjudication on the merits, Richter, 131 S. Ct.

20 at 784 ("determining whether a state court's decision resulted

21 from an unreasonable legal or factual conclusion does not require

22 that there be an opinion from the state court explaining the

23 state court's reasoning").   Because there was no reasoned state-

24 court decision at any level as to this subclaim, the Court

25 conducts an independent review of the record to determine whether

26 the supreme court, in denying this claim, was objectively

27 unreasonable in applying controlling federal law.   See Haney v.

28 Adams, 641 F.3d 1168, 1171 (9th Cir.) (holding that independent

1  review "is not de novo review of the constitutional issue, but

2  only a means to determine whether the state court decision is

3  objectively unreasonable" (internal quotation marks omitted)),

4  cert. denied, 132 S. Ct. 551 (2011); see also Richter, 131 S. Ct.

5  at 784, 786 (holding that "petitioner's burden still must be met

6  by showing there was no reasonable basis for the state court to

7  deny relief," and reviewing court "must determine what arguments

8  or theories supported or . . . could have supported[] the state

9  court's decision[,] and then it must ask whether it is possible

10  fairminded jurists could disagree that those arguments or

11  theories are inconsistent with the holding in a prior decision of

12  [the Supreme Court]").

13       Petitioner failed to raise his remaining four IAC subclaims

14  in the state supreme court.  In habeas petitions filed in the

15  superior court and court of appeal, Petitioner arguably raised

16  his subclaim that trial counsel was constitutionally ineffective

17  by refusing to follow instructions.[4]  (Lodged Doc. 18 at 3, 19,

18  21, 22.)  Petitioner raised his subclaim that trial counsel was

19  ineffective in failing to return Petitioner's case file in a

20  habeas petition filed in the superior court.  (Lodged Doc. 18 at

21  3.)  Petitioner failed to present to any state court his

---

24  [4]       Specifically, in the lower state courts Petitioner argued
that trial counsel was ineffective by refusing to follow
25  Petitioner's instruction, prior to resentencing, to "construct a
credible defense of cruel and unusual punishment under federal and
26  state constitutions based on prevailing case law, regulations, and
rules of court," the "guidelines of the U.S. Department of Justice
27  (DOJ) and Federal Trade Commission (FTC)," and the "blatant
disparity of punishments for similar crimes worldwide."  (Lodged
28  Doc. 18 at 3.)

1  subclaims that trial counsel was ineffective for failing to
2  obtain replacement counsel or that appellate counsel was
3  ineffective in failing to file habeas petitions.  Thus, those
4  four subclaims are unexhausted.  For a federal habeas court to
5  address an unexhausted claim on the merits, it must be "perfectly
6  clear that the applicant does not raise even a colorable federal
7  claim."  Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir.
8  2005).  Here, because it is clear that Petitioner's unexhausted
9  subclaims of ground one are not colorable, the Court exercises
10 its discretion to address and reject them on the merits under de
11 novo review.  Id.; see also Pirtle v. Morgan, 313 F.3d 1160, 1167
12 (9th Cir. 2002) (when no state-court decision on merits exists,
13 habeas review is de novo); Bybee v. Lewis, No. ED CV 11-1299-PSG
14 (PLA), 2012 WL 1325623, at *5 (C.D. Cal. Mar. 19) (reviewing
15 unexhausted but noncolorable habeas claim de novo), accepted by
16 2012 WL 1325547 (C.D. Cal. Apr. 16, 2012).

17      Petitioner first presented ground two, alleging that his
18 sentence constituted "cruel and unusual punishment," in a
19 February 3, 2010 petition filed with the superior court.  (Lodged
20 Doc. 18.)  The superior court denied the petition because it was
21 "untimely and successive," citing Clark, 5 Cal. 4th at 765, 797,
22 782, and Stankewitz, 40 Cal. 3d at 396 n.1.  (Lodged Doc. 19.)
23 The state court of appeal and supreme court summarily denied
24 subsequent petitions raising the same issue.  (Lodged Docs. 21,
25 22, 23, 24.)  The Court "looks through" those silent denials to
26 the state superior court's decision.  Bonner v. Carey, 425 F.3d
27 1145, 1148 n.13 (9th Cir. 2005).  Because the superior court
28 "clearly and expressly" rejected ground two as both untimely and

1  successive, see Harris v. Reed, 489 U.S. 255, 263, 109 S. Ct.

2  1038, 1043, 103 L. Ed. 2d 308 (1989) (holding that procedural

3  default does not bar habeas claim unless last reasoned

4  state-court decision "clearly and expressly" stated that judgment

5  rested on state procedural bar), and for the reasons set forth in

6  the Discussion section below, the Court does not address ground

7  two because it is procedurally defaulted, as Respondent argues.

8      Petitioner first presented grounds three, four, five, and

9  six on direct appeal to the state court of appeal, which rejected

10  them in a reasoned decision.  (Lodged Doc. 3; Lodged Doc. 5 at

11  16.)  Petitioner raised ground six in a petition for review filed

12  in the state supreme court, which summarily denied review.

13  (Lodged Docs. 6, 7.)  Petitioner then presented grounds three,

14  four, and five in the July 2010 habeas petition filed with the

15  state supreme court, which summarily denied them.  (Lodged Doc.

16  23 at 3; Lodged Doc. 24.)  The last reasoned decision regarding

17  the merits of grounds three, four, five, and six is the state

18  appellate-court decision on direct appeal.  See Ylst v.

19  Nunnemaker, 501 U.S. 797, 803, 805, 111 S. Ct. 2590, 2594-95, 115

20  L. Ed. 2d 706 (1991) (relevant state-court decision for purposes

21  of AEDPA review is last reasoned state judgement); see also

22  Berghuis v. Thompkins, 560 U.S. ___, 130 S. Ct. 2250, 2259, 176

23  L. Ed. 2d 1098 (2010) (looking through state supreme court's

24  silent denial of petition for review to reasoned opinion of court

25  of appeal as relevant state-court decision for purposes of AEDPA

26  review); Bonner, 425 F.3d at 1148 n.13 (applying Ylst to look

27  through two "level[s] of mute decision" regarding state habeas

28  petition (citation omitted)).  Because the state courts

1  adjudicated grounds three, four, five, and six on the merits, the

2  Court reviews them under the deferential AEDPA standard of

3  review.   See Richter, 131 S. Ct. at 784.

### SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

5  Because Petitioner challenges the sufficiency of the

6  evidence to support his convictions, the Court has independently

7  reviewed the state-court record and finds the following to be an

8  accurate recitation of what the evidence at trial showed.   See

9  Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

10  The State Bar suspended Petitioner from the practice of law

11  from August 13 to December 7, 1999.[5]   (Lodged Doc. 5 at 4;

12  Traverse at 2.)   Petitioner attempted to resign from the bar with

13  charges pending on November 30, 2000, and he was again suspended

14  from the bar on December 1.   (Lodged Doc. 2, 3 Rep.'s Tr. at 540-

15  41.)   Petitioner's resignation with charges pending became

16  effective March 11, 2001.   (Id.)

17  At trial, attorney Merritt McKeon testified that she worked

18  for Petitioner's law practice from June to November 1999.   (2

19  Lodged Doc., 2 Rep.'s Tr. at 283-84.)   McKeon later discovered

20  that Petitioner had used her signature stamp without her

21  authorization.   (Id. at 294-95.)

22  Attorney Donald Kemp testified that he worked for Petitioner

23  from August to November 2000.   (Lodged Doc. 2, 1 Rep.'s Tr. at

---

25      [5]   Petitioner testified that he received a 90-day suspension

26  that ended on November 11, 1999 (Lodged Doc. 2, 3 Rep.'s Tr. at
539), but, as Petitioner acknowledges in his Traverse, the State

27  Bar apparently made his reinstatement contingent on certain
conditions that were not satisfied until December 7 (id. at 597-60;

28  Traverse at 2).

35, 37-38.)   In mid-November 2000, Petitioner informed Kemp that
he was going to be suspended from the bar effective December 1
and offered him a raise if Petitioner could continue to operate
the firm under Kemp's bar number or, alternatively, a smaller
raise if Kemp would continue to make appearances at Petitioner's
direction while Petitioner acted as a consultant.   (Id. at 40-41,
46-50.)   Petitioner said that he would continue to be the
"primary strategist" on the cases.   (Id. at 42.)   Kemp rejected
the offer and resigned from the firm effective November 30, 2000.
(Id. at 43.)

<u>Count 1 — Richard Chavez</u>

Chavez testified that on January 21, 2001, he told
Petitioner that he was "in need of an aggressive attorney in an
effort to protect [his] son," and Petitioner responded that the
matter was "something that he could handle" and that they needed
an ex parte hearing.   (Lodged Doc. 2, 1 Rep.'s Tr. at 131-32.)
Petitioner advised Chavez to keep custody of his son even though
his visitation period was ending and said if his ex-wife
contacted the police, to "let the police know that we have [an ex
parte] hearing on Tuesday, and if there's an issue, they can
contact me."   (Id. at 132-33, 135.)   Petitioner recommended that
Chavez seek permanent custody rather than temporary custody of
his son because they could "always negotiate for something less."
(Id. at 136-37.)   Petitioner said that attorney-client privilege
would protect their conversation.   (Id. at 132-33, 136.)

The next day, January 22, 2001, Chavez again met with
Petitioner, who explained that he usually stayed in the office
and "ma[de] himself available to clients so he can advise them,"

1   and he introduced Chavez to attorney Dean Schroeter, who "does
2   the administrative side of going to court and handling the
3   proceeding." (Id. at 142.)  At the end of that meeting, Chavez
4   wrote a check for $3000 to "Ronald Lais." (Id. at 143.)  At that
5   point, no one had informed Chavez that Petitioner was not
6   authorized to practice law. (Id. at 144.)

7        On January 23, 2001, Chavez and Schroeter went to court.
8   (Id.)  The next day, Chavez called Petitioner to complain about
9   Schroeter's representation and said that he had just learned that
10  Petitioner had been disbarred. (Id. at 146.)  Petitioner became
11  "extremely angry" and said that he had not been disbarred, he had
12  resigned, and that he had a law license from India. (Id.)

13  Count 2 — Kathleen Monroe

14       Monroe testified that on October 29, 1999, she contacted
15  Petitioner after finding his website during an internet search.
16  (Lodged Doc. 2, 2 Rep.'s Tr. at 331-32, 335.)  She told
17  Petitioner that she needed an attorney who does "interstate law,"
18  and Petitioner responded that he was the "only game in town."
19  (Id. at 337.)  That same day, she met with Petitioner in his
20  office, which had law degrees on the wall, legal books on the
21  bookshelf, and a sign that said "Ronald E. Lais, Attorney at Law"
22  on his desk. (Id. at 336-37.)  Petitioner told Monroe that he
23  would be "very aggressive in handling the case" and advised her
24  to seek modification of her spousal and child support. (Id. at
25  339-40.)  Monroe wrote a check for $5000 to "Law Office of Ron
26  Lais" at Petitioner's instruction, along with a notation that it
27  was for "attorneys' fees." (Id. at 340-41.)  Petitioner never
28  informed Monroe that he had been suspended from the Bar. (Id. at

341, 345.)

Monroe later discovered through an internet search that Petitioner was suspended from the Bar, and she confronted him on November 17, 1999. (Id. at 345.) Petitioner told her that it was just a "misunderstanding with the Bar" that was being resolved and that it shouldn't be of concern to her. (Id.)

Count 3 — Jay and Rebecca Seagrave[6]

Jay testified that on September 7, 1999, he and Rebecca found Petitioner's contact information after searching the internet for an attorney to help Rebecca with a child custody dispute. (Lodged Doc. 2, 2 Rep.'s Tr. at 241-42.) On September 9, 1999, Jay told Petitioner that he and Rebecca wanted "an aggressive male attorney," and Petitioner responded that it was "a good thing" they had called him. (Id. at 249.) Petitioner told Jay and Rebecca that it would be "no problem" to handle the child custody issue and that he would file emergency custody orders the next day. (Id. at 244-46.) Petitioner told them that his fee for interstate child custody cases was $5000, which, at Petitioner's request, Rebecca wired to Petitioner that same day. (Id. at 246, 248.)

The next day, September 10, 1999, Petitioner told Jay and Rebecca to take Rebecca's child to the emergency room to document any abuse, which would be important for their case. (Id. at 261.) Petitioner said that he had not filed the emergency

---

[6] Because Jay and Rebecca Seagrave share the same last name, the Court refers to them by their first names. At the time of the events they testified about at trial, Jay and Rebecca were not married and Rebecca apparently went by the last name Wilson. (Lodged Doc. 2, 2 Rep.'s Tr. at 241.)

custody order because he had been in court all day.  (<u>Id.</u> at
262.)  On September 14, 1999, Jay demanded that Petitioner return
their fee.  (<u>Id.</u> at 263-64.)  Between September 9 and 14, 1999,
Petitioner never informed Jay that he was suspended from the Bar.
(<u>Id.</u> at 244-45, 251-52, 264-65.)

Rebecca testified that on September 9, 1999, Petitioner said
he would file the custody order the next day and told her not to
worry, everything would be fine.  (<u>Id.</u> at 274-75.)  After that
conversation, she wired $5000 to the account of "Ronald D. Lais,
Incorporated."  (<u>Id.</u> at 270-71.)  On September 10, 1999, however,
she discovered that Petitioner had not filed the motions and
"nothing had been done."  (<u>Id.</u> at 278.)  Between September 9 and
14, 1999, Petitioner never informed Rebecca that he was not
authorized to practice law.  (<u>Id.</u>)

<u>Count 4 — Jeremy and Johnnie Snow</u>[7]

Jeremy testified that he retained Petitioner in July 2000 to
represent him in a child custody case.  (Lodged Doc. 2, 2 Rep.'s
Tr. at 424.)  Because Jeremy was in the military and stationed in
Germany until May 2001, his mother, Johnnie, primarily
communicated with Petitioner.  (<u>Id.</u> at 426.)  Petitioner did not
advise Jeremy of his suspension from the practice of law at any
time before December 1, 2000, and Jeremy did not recall any
conversations with Petitioner after December 1.  (<u>Id.</u> at 429-30.)

Johnnie testified that between July and November 2000,
Petitioner never advised her that he was going to be suspended

_____

[7]   Because Jeremy Snow and his mother, Johnnie Snow, share
the same last name, the court refers to them by their first names.

20

1  from the Bar.  (Id. at 433-34.)  On December 1, 2000, Petitioner

2  said he would not be able to make a court date on December 4 and

3  that Jeremy and Johnnie should get another attorney, which would

4  save them money because Petitioner's per diem was so high.  (Id.

5  at 435-36.)  Petitioner told Johnnie what the other attorney

6  should do in court.  (Id.)  He also asked for another $5000 in

7  fees.  (Id. at 436.)  On December 8, 2000, Petitioner told

8  Johnnie that he had been suspended from the Bar.  (Id. at 440.)

9  Thereafter, Petitioner continued to assure Johnnie that he was

10 going to prepare documents to be filed, and he asked for another

11 $5000 for his legal research.  (Id. at 442-43, 446-53.)

12 Petitioner sent Johnnie a document retaining him as a "child

13 custody expert" and told her he wanted to keep the case "in

14 house."  (Id. at 443-44.)

15 Counts 6 & 7 — William Parkkonen and Attorney Nelson Mosher

16      Parkkonen testified that he had hired Petitioner in May 2000

17 to represent him in an interstate child custody and divorce case

18 and in 2000 paid Petitioner $10,000 in fees.  (Lodged Doc. 2, 2

19 Rep.'s Tr. at 299-302.)  On November 30, 2000, Petitioner

20 accompanied Parkkonen to court, and Parkkonen and his wife's

21 depositions were taken.  (Id. at 305-06.)  Sometime after

22 December 1, 2000, Parkkonen received a copy of his wife's

23 deposition in an envelope with a return address of "The Law

24 Office of Ronald E. Lais."  (Id. at 306-07.)  Between November

25 2000 and May 1, 2001, Parkkonen and Petitioner exchanged emails

26 about Parkkonen's child custody case, but Petitioner did not tell

27 Parkkonen that he had been suspended from the Bar.  (Id. at 307-

28 14, 317.)  Moreover, on January 17, 2001, Parkkonen told

1  Petitioner that he didn't want any other attorneys on his case,

2  and Petitioner responded that he would continue to handle it.

3  (Id. at 329-30.)

4      Attorney Mosher testified that he began representing

5  Parkkonen's wife in a child custody matter in July or August 2000

6  and that Petitioner represented Parkkonen.  (Lodged Doc. 2, 2

7  Rep.'s Tr. at 233-34.)  On November 30, 2000, Mosher and

8  Petitioner both appeared at a court date for that case, but

9  Petitioner did not inform Mosher that he would be suspended from

10  the Bar the following day.  (Id. at 236.)  On January 22, 2001,

11  Mosher sent Petitioner a letter addressed to "Ronald E. Lais,

12  Attorney at Law."  (Id. at 237-38.)  Between December 1, 2000,

13  and January 22, 2001, Petitioner never told Mosher that he had

14  been suspended from the state Bar.[8]  (Id. at 238-39.)

15  Counts 8 & 9 — David and Jeanne Seidman[9]

16      David testified that he first contacted Petitioner around

17  November 2000.  (Lodged Doc. 2, 1 Rep.'s Tr. at 162-63.)  David

18  told Petitioner that he needed a "real aggressive attorney," and

19  Petitioner responded, "I'm your man."  (Id. at 163.)  In November

20  2000, David and his wife, Jeanne, met with Petitioner to discuss

21  legal issues related to their child custody case and thereafter

22  communicated with him about once a week.  (Id. at 163-64.)  On

23  December 11, 2000, David arrived at Petitioner's office to

24  prepare for a deposition later that day.  (Id. at 165.)

25  ———————————

26      [8]  Mosher discovered that Petitioner had been suspended by
   reading about it in the state-bar newsletter.  (Id. at 239.)

27

28      [9]  Because David and Jeanne Seidman share the same last
   name, the Court refers to them by their first names.

1   Petitioner told him that another attorney, Schroeter, would
2   represent him at the deposition because Petitioner's "services
3   would be best served by him staying in his office." (Id. at
4   166.)  Petitioner also told David not to answer any questions
5   about finances at the deposition, and David followed that advice.
6   (Id. at 166-68.)  Petitioner did not inform David that he had
7   been suspended from the Bar.  (Id. at 166-67.)

8       In February and March 2001, David exchanged emails with
9   Petitioner at his email address, REL@LAISLAW.COM.  (Id. at 170-
10  76.)  David provided information for use in his case, and
11  Petitioner discussed David's case, answered a question about a
12  legal matter, told David that he would "evaluate" another issue,
13  and suggested filing a new lawsuit against other parties.  (Id.)
14  Although David was told that Petitioner and his associates worked
15  as a team, David believed that Petitioner was his attorney.  (Id.
16  at 182.)  David testified that he thought Petitioner "would be
17  consulting and being an advisor and giving me legal advice, and
18  [Attorney Schroeter] would go ahead and show up" in court.  (Id.
19  at 181.)  David also testified that Petitioner had said that it
20  would be "best" if Petitioner "worked in the office orchestrating
21  all the legal ramifications and whatever was going to happen
22  legally, and that other people would go to court."  (Id. at 187.)

23      David first discovered that Petitioner was not a licensed
24  attorney in February 2001.  (Id. at 185-87.)  Nevertheless, in
25  early to mid-2001, Petitioner continued to assure David that
26  "he'[d] won mostly all of the cases" like David's and that it
27  "look[ed] very positive."  (Id. at 189.)  From late November 2000
28  to early 2001, David paid Petitioner approximately $25,000 in

1 | fees.   (<u>Id.</u> at 168-69.)

2 |     Jeanne testified that she first met Petitioner in December

3 | 2000, and between then and April 2001, she met with Petitioner in

4 | person up to a dozen times and spoke with him on the phone many

5 | times.   (<u>Id.</u> at 192-94.)   During those conversations, Petitioner

6 | told Jeanne not to worry, that he was an "expert" and had "done

7 | this many times before" and described winning similar cases for

8 | other clients.   (<u>Id.</u> at 194-95.)   Petitioner asked Jeanne to

9 | provide him with documents "so that he could use [them] as

10 | evidence to present in court."   (<u>Id.</u> at 202.)   Petitioner also

11 | said he was the "head attorney," so it was more "effective" for

12 | him to be in the office.   (<u>Id.</u> at 197-98.)   In April 2001,

13 | Petitioner's paralegal told Jeanne that Petitioner would not be

14 | able to appear at an upcoming court date, and when Jeanne became

15 | worried, Petitioner came on the line and said there was "no

16 | problem," he was still her attorney, it would "all be handled"

17 | and was "going along as scheduled," and there was "nothing to

18 | worry about."   (<u>Id.</u> at 197.)

19 |     Attorney Gerald Phillips represented David's former wife.

20 | (Lodged Doc. 2, 2 Rep.'s Tr. 225-26.)   On December 10, 2000, the

21 | day before David's deposition, Phillips spoke with Petitioner,

22 | who said he was not going to appear with David at the deposition

23 | and asked that Phillips "not disclose to [David] any issues that

24 | he had with the state Bar."   (<u>Id.</u> at 228.)

25 | <u>Counts 10 & 11 – Michael Bakhtari and Attorneys Richard Thomas</u>

26 | <u>and Jill Church</u>

27 |     Michael Bakhtari contacted Petitioner in June 2000 because

28 | he needed a lawyer to help him with a child custody matter.

24

(Lodged Doc. 2, 2 Rep.'s Tr. at 351.)   Petitioner began acting as Bakhtari's lawyer and gave him advice on how to proceed with his case.   (Id. at 354.)   Petitioner told Bakhtari that he was "one hell of an attorney" who "knows how to talk to judges" and that he was going to have a dozen attorneys working for him.   (Id. at 357.)   Between December 1, 2000, and mid-April 2001, Bakhtari continued to discuss his case with Petitioner, but Petitioner never disclosed that he had been suspended from the Bar, and Bakhtari believed Petitioner was still his attorney.   (Id. at 355-56, 359-61, 369, 373.)   In April 2001, Bakhtari signed an agreement to hire Petitioner as a "consultant," which Bakhtari understood to mean that Petitioner would "go to civil court" and "get a judgment against the defendant."   (Id. at 368-69.)

Attorney Thomas testified that he represented Bakhtari from the spring of 2000 through the early part of 2001.   (Id. at 379.) Thomas and his associate, Jill Church, associated with Petitioner "because of his expertise in international law" and filed a document with the court indicating that Petitioner was serving as counsel with them.   (Id. at 383-84, 387-88.)   Beginning in 2000 and continuing into 2001, Petitioner advised Thomas and Church regarding Bakhtari's case.   (Id. at 383-84.)   At no time prior to March 2001 did Petitioner inform Thomas or Church that he had been suspended from the Bar.   (Id. at 387-88.)

Attorney Church testified that she discussed Bakhtari's case with Petitioner from 2000 into 2001, and that between December 1, 2000, and March 6, 2001, Petitioner never revealed that he was no longer entitled to practice law.   (Id. at 390-91, 394.)

Count 12 — Donna Turnbow

1   Turnbow retained Petitioner in August 2000 because she was
2   looking for a lawyer to handle her child custody case. (Id. at
3   470.) Before December 1, 2000, Petitioner never told Turnbow
4   that he was going to be suspended from the Bar. (Id. at 472.)
5   In December 2000, Turnbow went to Petitioner's office for a
6   deposition. (Id.) Petitioner told Turnbow that he had just been
7   suspended and so attorney Schroeter would ask the questions in
8   the deposition, but Petitioner would "guide him through." (Id.)
9   Petitioner told Turnbow that he could not perform the deposition
10  or appear in court for her, but he would still be the "main
11  attorney" on her case. (Id.) Schroeter attended another hearing
12  on January 18, 2001; prior to that date Turnbow spoke and emailed
13  with Petitioner about her case "numerous times," but she never
14  spoke with Schroeter. (Id. at 475.) Petitioner assured Turnbow
15  that "everything was in control" and he was "handling everything
16  appropriately." (Id. at 476.) In March 2001, Petitioner asked
17  Turnbow to sign a substitution of attorney and back-date it to
18  December 2000, but Turnbow refused. (Id. at 476-78.)

19  Count 13 — Christian Fuentes

20  Fuentes testified that Petitioner represented him from 1996
21  through 2001 in divorce and international child custody cases and
22  that he had paid Petitioner approximately $108,000. (Lodged Doc.
23  2, 1 Rep.'s Tr. at 54.) Between December 1, 2000, and March 18,
24  2001, Fuentes met with Petitioner about five times, had several
25  telephone conferences, and exchanged emails. (Id. at 56-57, 59-
26  63, 89.) Fuentes discussed his pending legal matters and "case
27  strategy" with Petitioner and relied upon his advice. (Id. at
28  56-63, 89.)

26

1    On December 16, 2000, Petitioner sent Fuentes a

2 substitution-of-attorney form.  (Id. at 61.)  Sometime after

3 that, Fuentes met with Petitioner to discuss the substitution,

4 and Petitioner said that he had been suspended and couldn't

5 practice law anymore.  (Id. at 76.)  After Petitioner was

6 suspended, Fuentes understood that a new lawyer would represent

7 him but he "would still get legal advice from [Petitioner]

8 because he was familiar with the case."  (Id. at 81, 83-84.)

9 Count 14 — Michael Camunas

10    Camunas testified that Petitioner began representing him in

11 an international paternity suit in April 2000.  (Id. at 416.)  At

12 some point, Petitioner said that he would be working with

13 attorney Schroeter, but Camunas never met Schroeter.  (Id. at

14 418.)  From December 2000 through 2001, Petitioner never told

15 Camunas that he was suspended or had resigned from the Bar.  (Id.

16 at 418-19.)  In January, February, and March 2001, Camunas and

17 Petitioner exchanged emails about garnishment papers and

18 Camunas's case.  (Id. at 420-22.)

19 Count 16 — Belinda Hunt

20    Hunt testified that she met with Petitioner on about January

21 19 and 22, 2001, because she was separated from her husband and

22 seeking legal counsel.  (Lodged Doc. 2, 3 Rep.'s Tr. at 510-11.)

23 Hunt asked Petitioner about alimony, child support, and what the

24 course of action should be, and Petitioner gave her calculations

25 of what kind of support she would receive.  (Id. at 513.)

26 Petitioner did not tell Hunt that he was suspended or had

27 resigned from the Bar.  (Id. at 511-12.)  At a third meeting,

28 Petitioner told Hunt that he was going to focus his practice on

international custody cases and no longer wanted to handle
divorces, and that attorney Schroeter would be handling her case
"under [Petitioner's] direction." (Id. at 517.) Hunt testified
that she understood that Petitioner would still be handling her
case and that Schroeter would work under Petitioner's direction.
(Id. at 520.) Hunt paid Petitioner $5200 in a check made out to
"Ron Lais." (Id. at 521-22.) Petitioner never revealed that he
was no longer entitled to practice law, and Hunt did not discover
that fact until a district attorney investigator called her.
(Id. at 530-31.)

Count 19 — Peter Mendez

Mendez was referred to Petitioner in January 2002, when he
was searching for a new attorney to represent him in a child
custody case. (Lodged Doc. 2, 2 Rep.'s Tr. at 395-96.) In a
phone conversation, Petitioner said that he believed he could
help Mendez with his case, but Petitioner did not reveal that he
was not a licensed attorney. (Id. at 397.) In January 2002,
Petitioner told Mendez that he "had a lot of experience in child
custody matters" and would handle Mendez's case. (Id. at 398-99,
401.) At the end of the meeting, Petitioner called Mendez's ex-
wife to tell her that he was representing Mendez. (Id. at 398-
99.)

Attorney Schroeter accompanied Mendez to court the following
week. (Id. at 403-04.) Mendez believed that Petitioner was
going to represent him but that Petitioner could not always be in
court at a given time. (Id. at 408.) In a meeting among Mendez,
Petitioner, and Schroeter, Schroeter asked Petitioner what he
should do in Mendez's case and Petitioner advised him. (Id. at

1  410.)  Mendez's legal matter was resolved in February 2002 except

2  for the filing of certain documents, and in March 2005,

3  Petitioner agreed to complete and file child custody orders.

4  (Id. at 411-14.)  At no time did Petitioner inform Mendez that he

5  was not authorized to practice law.  (Id. at 406.)

6  Count 21 — Zachariah Patrick and Terri Flynn

7       Patrick testified that he contacted Petitioner in January

8  2003 because he needed an attorney skilled in international

9  custody law to help him gain custody of his daughter, who lived

10  in Canada.  (Lodged Doc. 2, 3 Rep.'s Tr. at 494.)  He and his

11  fiancée, Flynn, met with Petitioner on January 6, 2003.  (Id. at

12  494-95.)  Petitioner told Patrick that he had plenty of

13  experience in those matters, it "wouldn't be a problem," they

14  should be able to get an ex parte order very rapidly, and Patrick

15  should have custody of his daughter within a week.  (Id. at 496.)

16  Petitioner said he would hire an attorney in Canada but that

17  Petitioner would be "driving the bus" and "controlling and

18  contacting" that attorney.  (Id. at 497-98.)  Patrick terminated

19  Petitioner in early March 2003.  (Id. at 499-501.)  Up until that

20  time, Petitioner never told Patrick that he was unauthorized to

21  practice law.  (Id. at 499.)

22       Flynn, an assistant U.S. Attorney, testified that she

23  accompanied Patrick to a meeting with Petitioner on January 6,

24  2003.  (Id. at 483.)  Petitioner said that he was an

25  international child law specialist and ran a consulting business.

26  (Id. at 484.)  Petitioner said he could retain attorneys in other

27  jurisdictions who would work with him to file lawsuits and that

28  it was better to go through Petitioner because "he knew all about

29

1  the laws of other countries and would work with [the other

2  attorney] to prepare the documents for the attorney to file in

3  the other district." (Id. at 484-85.) Petitioner said he would

4  immediately have an ex parte hearing set and that he would be

5  able to get Patrick's daughter out of Canada and with Patrick

6  within a week. (Id. at 485.) Petitioner said that he was a

7  "retired" attorney but that he would be "driving the bus" and

8  that neither Flynn nor Patrick was to contact the attorney in

9  Canada. (Id. at 486.)

10 Count 30 — Lewis and Lissette Perales[10]

11     Lissette testified that she found Petitioner's information

12 after searching the internet for a lawyer to help with her

13 husband's, Lewis's, child support case. (Lodged Doc. 2, 1 Rep.'s

14 Tr. at 213.) Lissette called Petitioner in early September 2002,

15 and Lissette and Lewis met with Petitioner on September 18. (Id.

16 at 213, 215.) Petitioner told them that he was a lawyer but was

17 not practicing in California at that time and was instead acting

18 as a "child consultant." (Id. at 214-15.) Petitioner said he

19 had lawyers working for him who would help Lissette and Lewis,

20 and he "would be advising [Lissette and Lewis] on what to do."

21 (Id. at 216.) Lissette testified that in December 2003, Lewis

22 received paperwork from San Diego County asking for information

23 about his wages; Petitioner had Lewis fax the documents to him

24 and then told him not to worry about them because Lewis had not

25 yet been served. (Id. at 217-18.) Lissette testified that she

26

27

28     [10]  Because Lissette and Lewis Perales share the same last
name, the Court refers to them by their first names.

1  never spoke to another attorney and communicated only with
2  Petitioner.  (Id. at 218.)

3       Lewis testified that he first met with Petitioner on
4  September 18, 2002, and that Petitioner said that he was a lawyer
5  but could not practice in California.  (Lodged Doc. 2, 1 Rep.'s
6  Tr. at 204.)  Petitioner nevertheless said that he could handle
7  Lewis's child custody case.  (Id. at 205.)  In September 2002,
8  Petitioner sent Lewis a proposed pleading, which Lewis signed and
9  returned to Petitioner.  (Id. at 209.)  Another time, Petitioner
10  said Lewis should forward any papers to him after he was served
11  and Petitioner "would take care of it."  (Id. at 210-11.)
12  Petitioner's Testimony

13       Petitioner testified at trial.  Among other things, he
14  testified that he was a child custody expert and never held
15  himself out as entitled to practice law after he had lost his
16  license.  (Lodged Doc. 2, 3 Rep.'s Tr. at 545-48, 553-56, 585-
17  87.)  Petitioner also claimed to have been qualified as an expert
18  in Orange County cases but said he couldn't remember any of the
19  case names or numbers.  (Id. at 601.)

20                          **DISCUSSION**[11]

21       As a preliminary matter, Respondent asserts that ground two
22  — which asserts that Petitioner's sentence constituted cruel and
23  unusual punishment — is procedurally defaulted because the state
24  superior court denied Petitioner's claim on the grounds that his
25  petition was untimely and successive.  (Answer Mem. P. & A. at

26  ────────────────

27       [11]  The Court has rearranged the order in which it addresses
    Petitioner's claims from that followed by the parties, in order to
28  avoid repetition and for other reasons.

                              31

29-31 (citing Lodged Doc. 19).)  Petitioner generally "denies
that any of the claims set forth in his Petition are procedurally
defaulted on any grounds."  (Traverse at 1.)  Moreover, although
Petitioner does not dispute that his February 3, 2010 state
habeas petition was untimely, he conclusorily claims that his
filing of successive petitions should be excused because his
first and second rounds of habeas concerned "largely separate and
distinct subjects," and he "did everything he could under the
circumstances to bring his claims in a timely fashion."
(Traverse at 26, 29.)

     In order for a claim to be procedurally defaulted for
federal habeas corpus purposes, "the application of the state
procedural rule must provide an adequate and independent state
law basis on which the state court can deny relief."  Park v.
California, 202 F.3d 1146, 1151 (9th Cir. 2000) (citations and
internal quotation marks omitted).  "For a state procedural rule
to be 'independent,' the state law basis for the decision must
not be interwoven with federal law."  La Crosse v. Kernan, 244
F.3d 702, 704 (9th Cir. 2001); cf. Morales v. Calderon, 85 F.3d
1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred
if the state decision 'fairly appears to rest primarily on
federal law, or to be interwoven with the federal law.'" (quoting
Coleman v. Thompson, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557,
115 L. Ed. 2d 640 (1991)).  In order for a state procedural bar
to be "adequate," the state courts must employ a "firmly
established and regularly followed state practice."  Ford v.
Georgia, 498 U.S. 411, 423-24, 111 S. Ct. 850, 857, 112 L. Ed. 2d
935 (1991).

1    Under California law, a petition must be filed without

2    "substantial delay," which is "measured from the time the

3    petitioner or his or her counsel knew, or reasonably should have

4    known, of the information offered in support of the claim and the

5    legal basis for the claim." In re Robbins, 18 Cal. 4th 770, 780,

6    77 Cal. Rptr. 2d 153, 159-60 (1998); accord Clark, 5 Cal. 4th at

7    765. A petitioner who "belatedly presents" a collateral attack

8    must explain that delay, particularly when he has made prior

9    attacks on the validity of the judgment. Clark, 5 Cal. 4th at

10   765. The U.S. Supreme Court has held that California's

11   timeliness requirement qualifies as an independent state ground

12   adequate to bar habeas relief in federal court. Walker v.

13   Martin, 562 U.S. ___, 131 S. Ct. 1120, 1128-30, 179 L. Ed. 2d 62

14   (2011).

15        "Once the state has adequately pled the existence of an

16   independent and adequate state procedural ground as an

17   affirmative defense, the burden to place that defense in issue

18   shifts to the petitioner." Bennett v. Mueller, 322 F.3d 573, 586

19   (9th Cir. 2003). The petitioner can satisfy this burden "by

20   asserting specific factual allegations that demonstrate the

21   inadequacy of the state procedure, including citation to

22   authority demonstrating inconsistent application of the rule."

23   Id. Assuming that the respondent has adequately pled the

24   existence of an independent and adequate state procedural ground

25   and the petitioner has not satisfied his burden of placing the

26   procedural-default defense at issue, habeas review is not barred

27   if the petitioner can demonstrate cause for his procedural

28   default and actual prejudice as a result of the alleged violation

1  of federal law.  See Coleman, 501 U.S. at 750; Bennett, 322 F.3d

2  at 580.  To satisfy his burden of demonstrating cause, the

3  petitioner must show "that some objective factor external to the

4  defense impeded counsel's efforts to comply with the State's

5  procedural rule."  Coleman, 501 U.S. at 753.  To show actual

6  prejudice, the petitioner must show that the errors at trial

7  "worked to his actual and substantial disadvantage, infecting his

8  entire trial with error of constitutional dimensions."  United

9  States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596, 71 L.

10 Ed. 2d 816 (1982) (emphasis in original).

11      In July 2005, Petitioner was convicted of 25 counts of

12 felony unlawful practice of law, and in October 2005, he was

13 sentenced to 14 years in state prison.  (Lodged Doc. 1, 4 Clerk's

14 Tr. at 716-19; Lodged Doc. 2, 4 Rep.'s Tr. at 683-84, 756-57.)

15 In May 2008, the court of appeal reversed some of Petitioner's

16 convictions and remanded for resentencing.  (Lodged Doc. 5.)  In

17 January 2009, Petitioner was resentenced to 12 years 8 months in

18 state prison.  (Lodged Doc. 8, 1 Clerk's Tr. at 298-99.)

19      Between May and December 2009, Petitioner filed four habeas

20 petitions in the state courts.  (Lodged Docs. 11, 13, 15, 17.)

21 Petitioner did not raise ground two until his fifth habeas

22 petition, which he filed in the superior court in February 2010,

23 nearly five years after his convictions and over a year after his

24 resentencing.  (Lodged Doc. 18 at 4.)  The superior court denied

25 both claims in the petition on the same two procedural grounds:

26      The petition is denied on grounds it is untimely and

27      successive.  Petitioner does not adequately explain the

28      long delay in presenting these claims of error or his

34

1    failure to raise these issues in his prior petition for
2    writ of habeas corpus filed with the court last year.  A
3    petitioner must explain and justify any significant delay
4    in seeking habeas corpus relief.  Absent justification
5    for the failure to present all known claims in a single,
6    timely petition for writ of habeas corpus, untimely and
7    successive petitions will be summarily denied.  (In re
8    Clark (1993) 5 Cal. 4th 750, 765, 797.)  A petitioner may
9    not delay filing a petition for writ of habeas corpus
10   until the judgment is affirmed on appeal.  (In re
11   Stankewitz (1985) 40 Cal. 3d 391, 396, fn. 1; In re
12   Clark, supra, 5 Cal. 4th at 782.)

13       Neither of petitioner's two claims of error amount
14   to a fundamental miscarriage of justice sufficient to
15   overcome     the     procedural     bar     against     judicial
16   consideration of untimely and successive requests for
17   habeas   corpus   relief.     Untimely   and/or   successive
18   requests   for   habeas   corpus   relief   will   only   be
19   entertained where it is demonstrated that a fundamental
20   miscarriage of justice occurred in any proceeding leading
21   to conviction and sentence.  (In re Clark, 5 Cal. 4th at
22   797-98.)
23   (Lodged Doc. 19 at 1-2.)  The state court of appeal and supreme
24   court summarily denied subsequent petitions raising ground two.
25   (Lodged Docs. 21, 22, 23, 24.)

26       Ground two is procedurally defaulted and thus the Court does
27   not consider its merits.  Respondent has asserted an independent
28   and adequate state procedural ground barring review of ground two

1  (Answer Mem. P. & A. at 29-31), and Petitioner has failed to

2  discharge his burden by demonstrating the inadequacy of

3  California's timeliness rule - indeed, Petitioner does not even

4  argue that the rule is in any way inadequate or inconsistently

5  applied.  As a result, the claim is procedurally barred unless

6  Petitioner can show cause and prejudice for the default.

7  Petitioner argues that his fifth habeas petition was not

8  successive because it pertained to the resentencing, whereas his

9  first four petitions pertained to the trial and original

10 sentencing.  (Traverse at 26-27.)  But Petitioner filed his first

11 four petitions months after he was resentenced, and thus at that

12 time Petitioner was aware of, and could have raised, any issues

13 related to resentencing.  Petitioner also asserts that he "did

14 everything he could under the circumstances to bring his claims

15 in a timely fashion," but he alleges no facts in support of that

16 assertion.  (Traverse at 29.)  Moreover, despite this

17 unidentified impediment, he was nevertheless able to file four

18 separate habeas petitions in the state courts before finally

19 raising ground two in his fifth petition.  Thus, Petitioner has

20 failed to overcome the default.  Accordingly, this Court does not

21 address ground two on the merits.[12]  See Paulino v. Castro, 371

22

---

23  [12]    The Supreme Court has recognized an exception to the
    requirement that the petitioner demonstrate both cause and
24  prejudice: if he can demonstrate that failure to consider the
    procedurally defaulted claim would result in a fundamental
25  miscarriage of justice because he is actually innocent of the
    crimes of which he was convicted.  See Coleman, 501 U.S. at 750. In
26  order to qualify for this "miscarriage of justice" exception,
    however, the petitioner must "support his allegations of
27  constitutional error with new reliable evidence — whether it be
    exculpatory scientific evidence, trustworthy eyewitness accounts,
28

1  F.3d 1083, 1093 (9th Cir. 2004) (finding claim procedurally
2  defaulted because petitioner "nowhere argues" inadequacy of state
3  procedural ground "[n]or does he suggest that there was cause for
4  his procedural default").

5      Respondent also asserts that ground one, alleging IAC, which
6  Petitioner also raised in his fifth state habeas petition and
7  which the state court also rejected as untimely and successive,
8  is procedurally defaulted.  (Answer Mem. P. & A. at 24-26.)  As
9  discussed above in the Standard of Review section, however, all
10 but one of the subclaims of ground one either were raised in the
11 state supreme court before Petitioner filed his fifth habeas
12 petition or were not raised in the fifth habeas petition.  (See
13 Lodged Doc. 17, 18.)  The superior court's denial of the fifth
14 petition as untimely and successive therefore could not have
15 resulted in a procedural bar as to those claims.  Only one
16 subclaim of ground one - that trial counsel was constitutionally
17 ineffective for failing to follow Petitioner's "instructions" -
18 was first raised in the fifth petition and therefore is arguably
19 procedurally barred.  Because it is easier to dispose of that
20 subclaim on the merits, however, the Court has not addressed
21
22 _____
23 or critical physical evidence — that was not presented at trial."
   Schlup v. Delo, 513 U.S. 298, 324, 115 S. Ct. 851, 865, 130 L. Ed.
24 2d 808 (1995) (recognizing that such evidence "is obviously
   unavailable in the vast majority of cases").  Further, to establish
25 the requisite probability that a constitutional violation has
   resulted in the conviction of one who is actually innocent, "the
26 petitioner must show that it is more likely than not that no
   reasonable juror would have convicted him in light of the new
27 evidence."  Id. at 327.  Here, Petitioner does not qualify for this
   exception both because he has not asserted it and because he has
28 not introduced any new reliable evidence.

37

1    Respondent's argument.  See Lambrix, 520 U.S. at 524-25;

2    Franklin, 290 F.3d at 1232 (noting that federal courts "are

3    empowered to, and in some cases should, reach the merits of

4    habeas petitions if they are, on their face and without regard to

5    any facts that could be developed below, clearly not meritorious

6    despite an asserted procedural bar"); see also Smith, 407 F.

7    App'x at 237-38 ("We need not address the state's procedural

8    default and exhaustion arguments because [the] petition is

9    clearly without merit.").

10   **I.**   **Habeas relief is not warranted on Petitioner's sufficiency-**

11       **of-the-evidence claim**

12       Petitioner contends in ground three of the Petition that the

13   evidence was insufficient to support his convictions because

14   "each alleged victim was represented by properly licensed counsel

15   and signed an engagement agreement acknowledging [his] role as a

16   qualified expert consultant in [his] field (child custody and

17   divorce)," and he "never held [himself out] as anything but a

18   consultant."  (Pet. at 6.)

19       The Due Process Clause of the 14th Amendment of the U.S.

20   Constitution protects a criminal defendant from conviction

21   "except upon proof beyond a reasonable doubt of every fact

22   necessary to constitute the crime with which he is charged."  In

23   re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d

24   368 (1970).  Thus, a state prisoner who alleges that the evidence

25   introduced at trial was insufficient to support the jury's

26   findings states a cognizable federal habeas claim.  Herrera v.

27   Collins, 506 U.S. 390, 401-02, 113 S. Ct. 853, 861, 122 L. Ed. 2d

28   203 (1993).

1    In considering a sufficiency-of-the-evidence claim, a court

2  must determine whether, "after viewing the evidence in the light

3  most favorable to the prosecution, <u>any</u> rational trier of fact

4  could have found the essential elements of the crime beyond a

5  reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.

6  Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (emphasis in original).

7  California's standard for determining the sufficiency of evidence

8  to support a conviction is identical to the federal standard

9  enunciated in <u>Jackson</u>. <u>People v. Johnson</u>, 26 Cal. 3d 557, 576,

10 162 Cal. Rptr. 431, 443 (1980). On habeas review, a state

11 court's resolution of a sufficiency-of-the-evidence claim is

12 evaluated under 28 U.S.C. § 2254(d)(1) rather than § 2254(d)(2).

13 <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

14    A federal habeas court reviews a sufficiency claim with an

15 additional layer of deference, in that relief is not warranted

16 unless the state court's application of <u>Jackson</u> was "objectively

17 unreasonable." <u>Id.</u> at 1274-75 & n.13. Thus, a federal habeas

18 petitioner "faces a heavy burden when challenging the sufficiency

19 of the evidence used to obtain a state conviction on federal due

20 process grounds." <u>Id.</u> at 1274. Under <u>Jackson</u>, a federal habeas

21 court "makes no determination of the facts in the ordinary sense

22 of resolving factual disputes." <u>Sarausad v. Porter</u>, 479 F.3d

23 671, 678 (9th Cir.) (internal quotation marks omitted), <u>vacated</u>

24 <u>in part</u>, 503 F.3d 822 (9th Cir. 2007), <u>rev'd on other grounds by</u>

25 <u>Waddington v. Sarausad</u>, 555 U.S. 179, 129 S. Ct. 823, 172 L. Ed.

26 2d 532 (2009). Rather, the reviewing court "must respect the

27 province of the jury to determine the credibility of witnesses,

28 resolve evidentiary conflicts, and draw reasonable inferences

1 from proven facts by assuming that the jury resolved all

2 conflicts in a manner that supports the verdict." Jones, 114

3 F.3d at 1008 (internal quotation marks omitted).

4     The reviewing court "must look to state law for the

5 substantive elements of the criminal offense," although the

6 "minimum amount of evidence that the Due Process Clause requires

7 to prove the offense is purely a matter of federal law." Coleman

8 v. Johnson, 566 U.S. ___, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d

9 978 (2012) (internal quotation marks omitted).  Before January 1,

10 2003, section 6126(b) provided that

11         [a]ny person who has been involuntarily enrolled as an

12         inactive member of the State Bar, or has been suspended

13         from  membership  from  the  State  Bar,  or  has  been

14         disbarred,  or  has  resigned  from  the  State  Bar  with

15         charges  pending,  and  thereafter  advertises  or  holds

16         himself  or  herself  out  as  practicing  or  otherwise

17         entitled to practice law, is guilty of a crime punishable

18         by imprisonment in the state prison or county jail.

19 Cal. Bus. & Prof. Code § 6126(b) (2002).  As of January 1, 2003,

20 section 6126(b) was amended to include "practic[ing] or

21 attempt[ing] to practice law" as among the punishable offenses.

22 2002 Cal. Legis. Serv. Ch. 394.  Previously, any person who

23 practiced or attempted to practice law without being an active

24 member of the state Bar was guilty of only a misdemeanor under

25 section 6126(a).  Cal. Bus. & Prof. Code § 6126(a) (2002).

26     The court of appeal denied Petitioner's claim:

27         . . . [Petitioner] challenges the sufficiency of the

28         evidence he held himself out as an attorney on most

40

1  counts . . . because the applicable written retainer
2  agreements signed by his clients did not identify him as
3  an attorney, but instead expressly stated he provided
4  "child custody and visitation *consulting services* to
5  [the] client . . . ." (Italics added.)  The flaw in this
6  argument is that, despite the terms of the agreement,
7  [Petitioner's] actions of assuring clients he was their
8  "main attorney" or was "directing" other attorneys
9  establishes that he was not merely acting as a
10  consultant, but rather held himself out as entitled to
11  practice law.  In sum, [Petitioner] was not entitled to
12  immunize himself with a misleading written disclaimer
13  that was at odds with his actual conduct.

14  (Lodged Doc. 5 at 16.)  Elsewhere, the court of appeal noted that
15  even when [Petitioner] advised some clients he had been
16  suspended by the bar, he held himself out as nevertheless
17  authorized to practice law by directing less experienced
18  attorneys on his clients' behalf.  His actions impliedly
19  represented to his clients he was entitled to practice
20  law in this manner so long as he did not, for example,
21  defend depositions or appear in court.

22  (Id. at 20.)

23  The court of appeal's rejection of this claim was not
24  objectively unreasonable.  The evidence amply established that
25  Petitioner held himself out as entitled to practice law.
26  Petitioner failed to inform attorneys, clients, and potential
27  clients that he had been suspended or had resigned from the Bar.
28  Petitioner also actively fostered the impression that he was a

41

1  practicing attorney by, for example, telling his victims that he
2  could handle their cases and file or prepare documents on their
3  behalf, advising them regarding case strategy, and discussing the
4  status of their cases.  Petitioner told some of his victims that
5  he would direct or guide other attorneys handling their case, he
6  was the "head attorney," or he preferred to stay in the office
7  while his other attorneys made court appearances.  Even when
8  Petitioner admitted that he had been suspended or claimed to be
9  "retired" — which usually occurred well into the representation —
10  he nevertheless gave assurances that led his victims to believe
11  he was still entitled to dispense legal advice and prepare legal
12  documents.  Petitioner's conduct was therefore more than
13  sufficient to show that he held himself out as entitled to
14  practice law.  Cf. United States v. Kieffer, 681 F.3d 1143, 1156
15  (10th Cir. 2012) (sufficient evidence supported nonattorney's
16  conviction for wire fraud under 18 U.S.C. § 1343 because, among
17  other things, by "[u]sing terms such as 'attorneys,' 'firm,'
18  'practice,' 'defense,' 'representation,' and 'advocacy,' and
19  listing his email address as hkieffer@dcounsel.com, Defendant
20  undoubtedly designed the content of his website to give the
21  impression that he was a criminal defense attorney authorized to
22  engage in the practice of law"); United States v. Kieffer, 621
23  F.3d 825, 832-33 (8th Cir. 2010) (sufficient evidence supported
24  nonattorney's conviction for mail fraud because he had "devised a
25  scheme to defraud others into believing he was a licensed
26  attorney" by, among other things, bragging "of an 85% success
27  rate in [28 U.S.C.] § 2255 motions"); see also In re Cadwell, 15
28  Cal. 3d 762, 770-71, 125 Cal. Rptr. 889, 893-94 (1975) (adopting

1 discipline recommendation when, among other things, suspended
2 attorney employed by attorney as law clerk held himself out to
3 both client and opposing counsel as a practicing attorney by (1)
4 meeting with client on behalf of law firm; (2) engaging in
5 settlement negotiations with opposing counsel on that client's
6 behalf; (3) signing letter to opposing counsel in employer
7 attorney's name "by" suspended attorney; and (4) failing to
8 clarify his status as legal assistant); Farnham v. State Bar, 17
9 Cal. 3d 605, 612, 131 Cal. Rptr. 661, 665 (1976) (adopting
10 discipline recommendation when suspended attorney held himself
11 out as entitled to practice law by stating that he would accept
12 case and complaint would be filed yet failed to inform client he
13 was under suspension); In re Naney, 51 Cal. 3d 186, 195, 270 Cal.
14 Rptr. 848, 853 (1990) (adopting recommendation of disbarment
15 when, among other things, suspended attorney impliedly "held
16 himself out as a person entitled to practice law" when he
17 submitted resume for position as in-house counsel, resume stated
18 attorney was admitted to State Bar but did not acknowledge he was
19 suspended from practice, and attorney did not mention suspension
20 during job interview).

21     As the court of appeal found, sufficient evidence supported
22 Petitioner's convictions even when his victims were represented
23 by other attorneys or signed agreements stating that Petitioner
24 was acting as a "consultant."  As the court observed, the written
25 disclaimer was contrary to Petitioner's statements to his victims
26 that he was handling their legal matters or directing and guiding
27 the other attorneys.  Thus, sufficient evidence supported
28 Petitioner's convictions, and the state court's rejection of this

43

1 | claim was not objectively unreasonable.   Petitioner is therefore
2 | not entitled to habeas relief on it.

3
4 | **II.   Habeas relief is not warranted on Petitioner's claim that**
5 | **his conviction constituted an ex post facto application of**
6 | **law**
7 | Petitioner argues in ground five of the Petition that
8 | section 6126(b) was a "fundamentally defective statute" when he
9 | was charged and that he was "prosecuted and convicted under the
10 | amended statute, which was not in effect at the time of the
11 | alleged offenses."   (Pet. at 6; see also Traverse at 33.)   Thus,
12 | he claims, his convictions violated the Ex Post Facto clause.

13 | The Constitution provides that "[n]o State shall . . . pass
14 | any . . . ex post facto Law."   U.S. Const. art. I, § 10.   A law
15 | violates the Ex Post Facto Clause if it (1) punishes as criminal
16 | an act that was not criminal when committed; (2) makes a crime's
17 | punishment greater than when the crime was committed; or (3)
18 | deprives a person of a defense available at the time the crime
19 | was committed.   Collins v. Youngblood, 497 U.S. 37, 42, 110 S.
20 | Ct. 2715, 2719, 111 L. Ed. 2d 30 (1990); Beazell v. Ohio, 269
21 | U.S. 167, 169-70, 46 S. Ct. 68, 68-69, 70 L. Ed. 216 (1925).   The
22 | Ex Post Facto Clause "is aimed at laws that retroactively alter
23 | the definition of crimes or increase the punishment for criminal
24 | acts."   California Dep't of Corr. v. Morales, 514 U.S. 499,
25 | 504-05, 115 S. Ct. 1597, 1601, 131 L. Ed. 2d 588 (1995)
26 | (citations and internal quotation marks omitted).   To establish
27 | an ex post facto violation, a petitioner must show that a
28 | retroactive change in the law created a "sufficient risk of

increasing the measure of punishment"; a "speculative and attenuated possibility" is insufficient.  Id. at 508-09; see also Garner v. Jones, 529 U.S. 244, 256, 120 S. Ct. 1362, 1370, 146 L. Ed. 2d 236 (2000) ("Without knowledge of whether retroactive application of [the law at issue] increases, to a significant degree, the likelihood or probability of prolonging [the prisoner's] incarceration, his claim rests upon speculation.").

As stated in Section I, before January 1, 2003, section 6126(b) provided that an attorney who had been suspended or had resigned from the State Bar with charges pending "and thereafter advertises or holds himself or herself out as practicing or otherwise entitled to practice law, is guilty of a crime punishable by imprisonment in the state prison or county jail." Cal. Bus. & Prof. Code § 6126(b) (2002).  Section 6126(a), meanwhile, provided that "[a]ny person" who was not an active member of the Bar who held himself out as entitled to practice law, "or otherwise practic[es] law," was guilty of a misdemeanor. Id. § 6126(a).  Thus, before 2003, a disbarred or suspended attorney could be convicted of a felony[13] for "hold[ing] himself . . . out" as entitled to practice law but only a misdemeanor for actually "practicing law."

The California Legislature amended section 6126 effective January 1, 2003.  2002 Cal. Legis. Serv. Ch. 394.  With regard to subsection (b), the Legislature explained that

---

[13]    In California, "[a] felony is a crime that is punishable with death, by imprisonment in the state prison, or notwithstanding any other provision of law, by imprisonment in a county jail under the provisions of subdivision (h) of Section 1170."  Cal. Penal Code § 17(a).

45

[e]xisting law provides that a person who holds himself or herself out as practicing or entitled to practice law is guilty of a crime punishable by imprisonment in the state prison or county jail if he or she has been (1) involuntarily enrolled as an inactive member of the State Bar, (2) suspended from membership from the State Bar, (3) disbarred, or (4) has resigned from the State Bar with charges pending.

This bill would provide that the penalties also apply if a person meeting that criteria practices or attempts to practice law.

Id. Thus, the amended version of section 6126(b) provided, in relevant part:

Any person who has been involuntarily enrolled as an inactive member of the State Bar, or has been suspended from membership from the State Bar, or has been disbarred, or has resigned from the State Bar with charges pending, and thereafter practices or attempts to practice law, advertises or holds himself or herself out as practicing or otherwise entitled to practice law, is guilty of a crime punishable by imprisonment in the state prison or county jail.

Cal. Bus. & Prof. Code § 6126(b) (2003) (emphasis added).[14]

The court of appeal denied Petitioner's claim that his conviction violated ex post facto principles. After noting that

---

[14]    Section 6126(b)'s sentencing provision has since been amended to add references to California Penal Code section 1170(h). 2011 Cal. Legis. Serv. Ch. 15.

1 the 2003 amendment "elevat[ed] the practice or attempted practice
2 of law by a former attorney to a felony," the court found that

3      [t]his statutory change, however, has no relevance here
4      because the information charged [Petitioner] not with the
5      actual practice of law, but with holding himself out as
6      entitled to practice, which was a felony both before and
7      after 2003.

8          The prosecutor did not attempt to prove [Petitioner]
9      actually practiced law, but rather that he represented he
10     was entitled to do so, as charged in the information.
11     Accordingly, we see no reason to conclude the trial court
12     found [Petitioner] guilty of violating the portion of
13     section 6126, subdivision (b), aimed at the actual
14     practice of law. Rather, we presume the court, guided by
15     the information, decided the cause based on the evidence
16     presented.   (Evid. Code, § 664.)   Consequently, the ex
17     post facto bar on which [Petitioner] relies has no
18     application here.

19 (Lodged Doc. 5 at 24-25.)

20      The court of appeal's denial of Petitioner's claim was not
21 objectively unreasonable.  As the court of appeal found, counts 1
22 through 4 and 6 through 18, which concerned Petitioner's
23 activities before 2003, alleged that Petitioner had "advertis[ed]
24 and h[eld] himself/herself out as practicing or otherwise
25 entitled to practice law" but did not allege that he had actually

26
27
28

1   practiced or attempted to practice law.[15]   (Lodged Doc. 1, 3
2   Clerk's Tr. at 556-63.)   Count 19, which involved Mendez, alleged
3   a violation of section 6126(b) for conduct occurring from 2002 to
4   2003, based on either "holding himself out" as entitled to
5   practice law or actually practicing law, but the evidence for
6   that count, like the others alleging pre-2003 violations,
7   supported a finding that Petitioner held himself out as entitled
8   to practice law.   For example, Mendez testified that Petitioner
9   said that he would handle Mendez's case (Lodged Doc. 2, 2 Rep.'s
10  Tr. at 397-99, 401) and told Mendez's ex-wife, in Mendez's
11  presence, that he was representing Mendez (id. at 398-99), and
12  Petitioner never revealed that he was not authorized to practice
13  law (id. at 406).

14      Indeed, the trial court, when rendering its verdict, made
15  findings consistent with the pre-2003 language of section
16  6126(b), stating that there was "more than sufficient evidence to
17  lead this court to believe beyond a reasonable doubt that
18  [Petitioner] did indeed willfully, unlawfully advertise and hold
19  himself out as practicing or otherwise entitled to practice as an
20  attorney, to practice law after having resigned from the state
21  bar with charges pending." (Lodged Doc. 2, 4 Rep.'s Tr. at 682.)
22  Such activity was a felony both before and after 2003 and thus
23  could not have resulted in an ex post facto application of the
24  amended statute.   The state court's rejection of this claim was
25  not objectively unreasonable.   Accordingly, Petitioner is not
26
27  _____
28      [15]   Count 5 alleged a misdemeanor violation of section
    6126(a).

                                48

1  entitled to habeas relief.

2  III. **Habeas relief is not warranted on Petitioner's equal-**

3  **protection claim**

4      Petitioner claims in ground four of the Petition that he was

5  denied equal protection of the law because "[s]uspended,

6  resigned, and disbarred attorneys are treated more severely than

7  laypersons who commit [unlawful practice of law]," and "[t]here

8  is no justification in fact or law for felony [unlawful practice

9  of law]." (Pet at 6.) In his Traverse, Petitioner argues that

10 "the fundamental basis of the whole concept of UPL is competency"

11 and his 25 years of experience practicing law "is evidence enough

12 that Petitioner's competence exceeds that of a layperson."

13 (Traverse at 32.) Thus, Petitioner argues, his convictions

14 should have been misdemeanors because "former lawyers are less

15 dangerous than layman [sic] when committing UPL." (Id. at 32-

16 33.)

17     The Equal Protection Clause essentially directs that all

18 persons similarly situated should be treated alike. City of

19 Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S. Ct.

20 3249, 3254, 87 L. Ed. 2d 313 (1985). Legislative classifications

21 that disadvantage a "suspect class" or impinge on a fundamental

22 right are subjected to strict scrutiny. Id. at 440-41; see also

23 Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312, 96 S. Ct. 2562,

24 2566, 49 L. Ed. 2d 520 (1976). Otherwise, a legislative

25 classification is analyzed under a "rational basis" standard of

26 review and is valid if it is rationally related to a legitimate

27 state interest. City of Cleburne, 473 U.S. at 440. Under

28 rational-basis review, "[c]lassifications are set aside only if

they are based solely on reasons totally unrelated to the pursuit
of the State's goals and only if no grounds can be conceived to
justify them." <u>Clements v. Fashing</u>, 457 U.S. 957, 963, 102 S.
Ct. 2836, 2843, 73 L. Ed. 2d 508 (1982); <u>accord</u> <u>Heller v. Doe</u>,
509 U.S. 312, 320, 113 S. Ct. 2637, 2642, 125 L. Ed. 257 (1993)
(under rational-basis review, classification "must be upheld
against equal protection challenge if there is any reasonably
conceivable state of facts that could provide a rational basis
for the classification" (citation and internal quotation marks
omitted)).

The court of appeal rejected Petitioner's claim that the
California Legislature violated the Equal Protection Clause by
making unauthorized practice of law a misdemeanor for laymen but
a felony for defrocked lawyers:

> The Legislature . . . could reasonably conclude former
> lawyers pose a greater danger of misleading clients that
> they are entitled to practice law and that greater
> deterrence was appropriate for those whose suspension or
> disbarment demonstrates ample willingness to flout rules
> and standards.  In short, because nonlawyers and former
> lawyers are not similarly situated, [Petitioner's] equal
> protection argument fails.  (See <u>People ex rel. Younger</u>
> <u>v. County of El Dorado</u> (1971) 5 Cal. 3d 480, 502 [equal
> protection "means simply 'that persons similarly situated
> with respect to the legitimate purpose of the law receive
> like treatment'"].)

(Lodged Doc. 5 at 25.)

The court of appeal's rejection of Petitioner's claim was

1 not objectively unreasonable.  Petitioner has alleged only that
2 he is an attorney who was suspended or who resigned from the
3 State Bar with disciplinary charges pending, not that he was
4 discriminated against because of his membership in a suspect
5 class.  See City of Cleburne, 473 U.S. at 440-41 (distinctions
6 based on race, alienage, national origin, or sex are subject to
7 higher level of scrutiny).  Thus, the California Legislature's
8 decision to make unlawful practice of law a misdemeanor for
9 laymen but a felony for certain former attorneys need only be
10 "rationally related to a legitimate state interest" in order to
11 survive an equal protection challenge.  Id. at 440.
12      California has a legitimate interest in protecting the
13 public from harm caused by disbarred or suspended lawyers
14 providing legal services.  See Berry v. Grau, No.
15 CV04-2309-PHX-SRB, 2006 WL 839162, at *7 (D. Ariz. Mar. 30, 2006)
16 (state has legitimate interest in protecting public from harm
17 caused by nonlawyers providing legal services, and "[p]rohibiting
18 disbarred lawyers from owning [legal-document-preparation]
19 businesses is rationally related to that interest"), aff'd 286 F.
20 App'x 433 (9th Cir. 2008) ("Plaintiffs have failed to show that
21 the distinction between disbarred attorneys and people who have
22 never been attorneys is not rationally related to a legitimate
23 governmental purpose.").  As the court of appeal found, the
24 California Legislature could rationally conclude that attorneys
25 who continue to hold themselves out to practice law even after
26 suspension, disbarment, or resignation with disciplinary charges
27 pending should be more severely penalized than laymen who engage
28 in similar conduct.  Former attorneys can more easily mislead

1  people into believing that they are entitled to practice law than
2  laymen can, as they may have reputations as attorneys,
3  relationships with former clients, and the knowledge necessary to
4  convince victims that they are able to perform legal work on
5  their behalf.  Thus, section 6126 does not violate the Equal
6  Protection Clause, particularly given that "courts are compelled
7  under rational-basis review to accept a legislature's
8  generalizations even when there is an imperfect fit between means
9  and ends."  Heller, 509 U.S. at 321.  Petitioner is not entitled
10 to habeas relief on this claim.

11 **IV.  Habeas relief is not warranted on Petitioner's claim that**
12 **    section 6126(b) is unconstitutionally vague and overbroad**

13        Petitioner argues in ground six of the Petition that section
14 6126(b) is unconstitutionally vague and overbroad because it is
15 "confusing" and "uncertain" and "does not adhere to precepts set
16 forth by the U.S. Department of Justice and Federal Trade
17 Commission concerning the construction of [unlawful practice of
18 law] statutes and permissible activities to be restricted
19 thereby."  (Pet. at Attach. 6(a).)  Petitioner argues that the
20 California Supreme Court "wrestled" with the definition of
21 unlawful practice of law in Birbrower, Montalbano, Condon & Frank
22 v. Superior Court, 17 Cal. 4th 119, 128, 70 Cal. Rptr. 2d 304
23 (1998), and "[t]he state courts should not be entitled to
24 deference where their own cases are unsettled."  (Traverse at 33-
25 34.)  Petitioner also argues that the prosecutor, by making a
26 plea offer prior to trial, "was acknowledging that the law of
27 [unlawful practice of law] in California was unsettled."  (Id. at
28 34.)

                                52

1   Due process requires that a criminal statute "give a person
2   of ordinary intelligence fair notice that his contemplated
3   conduct is forbidden by the statute." <u>Bouie v. City of Columbia</u>,
4   378 U.S. 347, 351, 84 S. Ct. 1697, 1701, 12 L. Ed. 2d 894 (1964);
5   <u>Mendez v. Small</u>, 298 F.3d 1154, 1158 (9th Cir. 2002).  "[T]he
6   void-for-vagueness doctrine requires that a penal statute define
7   the criminal offense with sufficient definiteness that ordinary
8   people can understand what conduct is prohibited and in a manner
9   that does not encourage arbitrary and discriminatory
10  enforcement." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357, 103 S. Ct.
11  1855, 1858, 75 L. Ed. 2d 903 (1983).

12  The court of appeal rejected Petitioner's claim:

13       [Petitioner] attacks section 6126 as vague and
14       overbroad but our Supreme Court has repeatedly rejected
15       these claims, most recently in <u>Birbrower</u>.[16] (<u>Birbrower</u>,
16       <u>supra</u>, 17 Cal. 4th at p. 128; <u>see</u>, <u>e.g.</u>, <u>People v.</u>
17       <u>Merchants Protective Corp.</u> (1922) 189 Cal. 531, 535
18       (<u>Merchants</u>).) In <u>Birbrower</u>, the Supreme Court noted the
19       Legislature did not define "'practice law,'" but "case
20       law explained it as "'the doing and performing services
21       in a court of justice in any matter depending therein
22       throughout its various stages and in conformity with the
23       adopted rules of procedure."' [Citation.] <u>Merchants</u>
24       included in its definition *legal advice* and legal

---

[16]   <u>Birbrower</u> addressed a violation of California Business
27  and Professions Code section 6125, which is premised on the
    unauthorized practice of law, not section 6126(b).  17 Cal. 4th at
28  124.

1    instrument and contract preparation, *whether or not these*
2    *subjects were rendered in the course of litigation.*"
3    (<u>Birbrower</u>, at p. 128, italics added.)   The <u>Birbrower</u>
4    court endorsed precedent concluding that the Legislature
5    "'accepted   both   the   definition   already   judicially
6    supplied for the term and the declaration of the Supreme
7    Court [in <u>Merchants</u>] that it had a sufficiently definite
8    meaning   to   need   no   further   definition   .   .   .   .'"
9    (<u>Birbrower</u>, at p. 128.)

10        [Petitioner]   relies   on   Justice   Kennard's   lone
11   dissent in <u>Birbrower</u>, including her lengthy quotation
12   from a respected law journal, . . . but this view did not
13   carry   the   day.     Echoing   the   <u>Birbrower</u>   dissent,
14   [Petitioner] argues "the complexities of modern life did
15   not exist when <u>Merchants</u> was decided," but this point has
16   no new salience since the Supreme Court majority turned
17   it aside.    (<u>Auto Equity Sales, Inc. v. Superior Court</u>
18   (1962) 57 Cal.2d 450, 455.)   [Petitioner] contends his
19   challenge warrants particularly close scrutiny based on
20   the First Amendment, but there is no free speech right to
21   give legal advice without a license.  (<u>Howard v. Superior</u>
22   <u>Court</u> (1975) 52 Cal. App. 3d 722, 727.)   [Petitioner's]
23   vagueness and overbreadth arguments are therefore without
24   merit.

25  (Lodged Doc. 5 at 25-26 (footnote omitted).)

26       The court of appeal's denial of this claim was not
27  objectively unreasonable.  As the court of appeal found (Lodged
28  Doc. 5 at 25-26), the <u>Birbrower</u> majority noted that settled case

1  law defined the term "practice of law" to include performing

2  services in court, giving legal advice, and preparing legal

3  instruments and contracts, whether or not those services were

4  rendered in the course of litigation.   17 Cal. 4th at 128.   In

5  doing so, the majority rejected the dissent's argument that the

6  definition was overbroad because for many professionals, such as

7  accountants, bankers, real estate brokers, and insurance agents,

8  "it would be impossible to give intelligent counsel without

9  reference to legal concerns."   Id. at 144.   With reasoning along

10 the lines of that in Birbrower, the Ninth Circuit has found that

11 a similar definition of the term "practice of law" was not

12 unconstitutionally vague or overbroad.   See Berry, 286 F. App'x

13 at 433-34 (finding definition of "practice of law" in Arizona

14 Supreme Court Rule 31 not unconstitutionally vague or

15 overbroad).[17]

16 ————————————

17    [17]    Arizona Supreme Court Rule 31 defines "practice of law"
   as "providing legal advice or services to or for another" by:

18
       (1) preparing any document in any medium intended to
19     affect or secure legal rights for a specific person or
       entity;
20

21     (2) preparing or expressing legal opinions;

22     (3) representing another in a judicial, quasi-judicial,
       or administrative proceeding, or other formal dispute
23     resolution process such as arbitration and mediation;

24     (4) preparing any document through any medium for filing
25     in any court, administrative agency or tribunal for a
       specific person or entity; or
26
       (5) negotiating legal rights or responsibilities for a
27     specific person or entity.

28 Ariz. Sup. Ct. R. 31.

1      Petitioner summarily asserts that the appellate courts
2 nevertheless "continue to wrestle" with what "practice of law"
3 means, but he cites no facts or cases that support his assertion.
4 (Traverse at 33-34.)  Petitioner also summarily states that the
5 prosecutor, by making a plea offer, somehow implicitly
6 "acknowledg[ed] that the law of [unlawful practice of law] was
7 unsettled, and that there were no criminal precedents to work
8 from."  (Traverse at 33-34.)  Even assuming the truth of
9 Petitioner's bare assertion that the prosecutor subjectively
10 believed the law to be unsettled, Petitioner fails to show how
11 that would prove that section 6126(b) is unconstitutionally vague
12 and overbroad.  Petitioner's conclusory allegations are
13 insufficient to warrant habeas relief.[18]  See James v. Borg, 24
14 F.3d 20, 26 (9th Cir. 1994).

15      Finally, Petitioner asserts that section 6126(b) is vague
16 and overbroad because it does not adhere to "precepts set forth
17 by the U.S. Department of Justice and Federal Trade Commission
18 concerning the construction of [unlawful practice of law]
19 statutes and permissible activities to be restricted."  (Pet. at
20 Attach. 6(a).)  Petitioner did not attach a copy of the alluded-
21 to document to his Petition or Traverse, but a December 2002
22 letter submitted to the American Bar Association by the DOJ and
23 FTC was attached to a habeas petition he filed in state court.

24

25      [18]   Petitioner's 34-page Traverse includes no specific
citations to the record; he occasionally cites to a lodgment, but
26 he never provides a page citation.  The lack of record cites
renders his conclusory assertions all the more unacceptable.  See
27 Hernandez v. Martel, 824 F. Supp. 2d 1025, 1111 (C.D. Cal. 2011)
(denying habeas claim in part because petitioner provided no record
28 citations to support it).

(Lodged Doc. 15 at Ex. E.)  That letter, which concerned "Comments on the American Bar Association's Proposed Model Definition of the Practice of Law," did not discuss section 6126(b), nor is it binding on this Court, the California state courts, or the California legislature.  (See id.)  Moreover, the DOJ and FTC's comments concerned maintaining competition between lawyers and certain nonlawyer professionals in order to benefit the public, for example, real estate agents' assistance in real estate transfers, accountants' preparation of tax returns, and financial planners' advice as to certain governing financial laws.  (Id. at 1-4.)  The DOJ and FTC argued that "accountants, bankers, real estate brokers and others skilled in business should remain able to provide advice and legal information related to their particular practices without harming the public."  (Id. at 6.)  Those concerns, which relate exclusively to people who are not and have never been lawyers, do not apply here, where a defrocked attorney, acting under the guise of an "expert consultant" on the law, has collected large fees while conveying to former and new clients seeking an attorney that he could "handle" their cases.

Petitioner is not entitled to habeas relief on this claim.

**V.    Habeas relief is not warranted on Petitioner's IAC claims**

Petitioner argues in ground one of the Petition that his trial and appellate counsel were constitutionally ineffective. (Pet. at 5; Traverse at 3-16.)

Under Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), a petitioner claiming IAC must show that counsel's performance was deficient and that

the deficient performance prejudiced his defense. "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial. <u>Id.</u> at 688-89. To show deficient performance, the petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id.</u> at 690. Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." <u>Id.</u> The initial court considering the claim must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Id.</u>

The Supreme Court has recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id.</u> at 689. Accordingly, to overturn the strong presumption of adequate assistance, the petitioner must demonstrate that the challenged action could not reasonably be considered sound trial strategy under the circumstances of the case. <u>Id.</u>

To meet his burden of showing the distinctive kind of "prejudice" required by <u>Strickland</u>, the petitioner must affirmatively

> show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

1  confidence in the outcome.

2  Id. at 694; see also Richter, 131 S. Ct. at 791 ("In assessing

3  prejudice under Strickland, the question is not whether a court

4  can be certain counsel's performance had no effect on the outcome

5  or whether it is possible a reasonable doubt might have been

6  established if counsel acted differently."). A court deciding an

7  IAC claim need not address both components of the inquiry if the

8  petitioner makes an insufficient showing on one. Strickland, 466

9  U.S. at 697.

10  In Richter, the Supreme Court reiterated that AEDPA requires

11  an additional level of deference to a state-court decision

12  rejecting an IAC claim:

13      The pivotal question is whether the state court's

14      application of the Strickland standard was unreasonable.

15      This is different from asking whether defense counsel's

16      performance fell below Strickland's standard.

17  131 S. Ct. at 785. The Supreme Court further explained,

18      Establishing that a state court's application of

19      Strickland was unreasonable under § 2254(d) is all the

20      more difficult. The standards created by Strickland and

21      § 2254(d) are both "highly deferential," . . . and when

22      the two apply in tandem, review is "doubly" so. The

23      Strickland standard is a general one, so the range of

24      reasonable applications is substantial. Federal habeas

25      courts must guard against the danger of equating

26      unreasonableness under Strickland with unreasonableness

27      under § 2254(d). When § 2254(d) applies, the question is

28      not whether counsel's actions were reasonable. The

59

1      question is whether there is any reasonable argument that

2      counsel satisfied <u>Strickland</u>'s deferential standard.

3  <u>Id.</u> at 788 (citations omitted).

4      A.   <u>Trial Counsel</u>

5      Petitioner argues that the performance of his trial counsel

6  was constitutionally ineffective because he failed to (1)

7  "investigate and prepare for trial"; (2) "communicate offer of

8  plea bargain"; (3) "follow instructions in trial and post-trial

9  proceedings"; (4) "return case file"; (5) "obtain replacement

10  counsel"; (6) "present evidence at trial"; or (7) "object to

11  improper evidence."  (Pet. at 5.)

12      1.   *Alleged failure to prepare for trial*

13      Petitioner argues that counsel failed to prepare for trial

14  by failing to develop a "theory of the case" based on

15  Petitioner's "consultancy business model."  (Traverse at 4.)

16  Contrary to Petitioner's argument, counsel did raise, both before

17  and during trial, the argument that Petitioner was acting only as

18  a consultant and not as an attorney.  Prior to trial, counsel

19  filed and subsequently argued a motion to dismiss averring that

20  the victims could not have believed Petitioner was entitled to

21  practice law because they received an email or letter or signed

22  an engagement agreement stating that Petitioner was not a lawyer;

23  he also argued that Petitioner was acting as an expert on child

24  custody and not as a lawyer.  (Lodged Doc. 1, 3 Clerk's Tr. at

25  602-05; Lodged Doc. 2, 1 Rep.'s Tr. at 22-24.)  At trial, counsel

26  called Petitioner as a witness, and Petitioner testified

27  extensively about his "business model" and the retainer

28  agreements he used as part of his "consulting operation."

1   (Lodged Doc. 2, 3 Rep.'s Tr. at 545-47, 553-56, 585-87.)   Indeed,

2   many of the agreements to engage a "consultant" were introduced

3   into evidence at trial (<u>see</u> Lodged Doc. 1, 4 Clerk's Tr. at 625-

4   40 (exhibit list showing retainer agreements for Chavez, David,

5   Monroe, Parkkonen, Bakhtari, Snow, Patrick, Hunt)), and counsel

6   questioned Petitioner about them on direct examination (Lodged

7   Doc. 2, 3 Rep.'s Tr. at 565-66, 584).   Counsel also questioned

8   Petitioner about his relationship with attorneys McKeon, Kemp,

9   and Schroeter (<u>id.</u> at 549-50, 555-56, 568-70), his

10  representations to attorney Mosher (<u>id.</u> at 566-67), and his

11  "consultant" arrangement with Fuentes (<u>id.</u> at 556-58), Chavez

12  (<u>id.</u> at 561-63), David and Jeanne (<u>id.</u> at 563-65), Lissette and

13  Lewis (<u>id.</u> at 566), Parkkonen (<u>id.</u> at 566-67), Rebecca and Jay

14  (<u>id.</u> at 567-69), Monroe (<u>id.</u> at 571, 574-75), Bakhtari (<u>id.</u> at

15  575-78), Mendez (<u>id.</u> at 578-80), Camunas (<u>id.</u> at 580-81), Jeremy

16  and Johnnie (<u>id.</u> at 581-84, 587-88), Turnbow (<u>id.</u> at 589-91), and

17  Patrick and Flynn (<u>id.</u> at 591-92).   Petitioner also testified,

18  more generally, that he never held himself out as entitled to

19  practice law or stated that he would "handle" anyone's case.

20  (Lodged Doc. 2, 3 Rep.'s Tr. at 548, 587.)   Thus, as a factual

21  matter, Petitioner's claim fails.

22       Petitioner also argues that his attorney was ineffective by

23  failing to conduct "meaningful cross-examination of adverse trial

24  witnesses."   (Traverse at 4.)   But counsel in fact cross-examined

25  most of the prosecution's witnesses.   (<u>See, e.g.</u>, Lodged Doc. 2,

26  1 Rep.'s Tr. at 73-88 (Fuentes), 150-55 (Chavez), 181-87 (David),

27  190-91 (David); Lodged Doc. 2, 2 Rep.'s Tr. at 239-40 (Mosher),

28  265-68 (Jay), 280-81 (Rebecca), 295-96 (McKeon), 323-30

(Parkkonen), 366-72 (Bakhtari), 386-87 (Thomas), 406-09 (Mendez), 431 (Jeremy), 455 (Johnnie); Lodged Doc. 2, 2 Rep.'s Tr. at 502-08 (Patrick), 523-29 (Hunt).)  Petitioner fails to state with any particularity what other questions counsel should have asked or how the responses would have changed the outcome of his trial. In any event, counsel's alleged decision not to ask certain questions on cross-examination was simply a matter of trial strategy, and Petitioner's mere criticism of counsel's tactics is insufficient to warrant habeas relief.  See Dows v. Wood, 211 F.3d 480, 487 (9th Cir. 2000) ("counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference"); see also Reynoso v. Giurbino, 462 F.3d 1099, 1113 (9th Cir. 2006) (holding that generally, tactical decisions, such as counsel's approach to impeachment, "do not constitute deficient conduct simply because there are better options"); Gustave v. United States, 627 F.2d 901, 904 (9th Cir. 1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

Petitioner also summarily asserts that counsel was ineffective by failing to (1) conduct "investigation or discovery"; (2) file a "pretrial Penal Code § 1538.5 motion to suppress evidence"; (3) "prepare to examine Petitioner when he testified"; (4) prepare jury instructions "to identify and develop legal issues"; (5) issue subpoenas for "potential trial witnesses or documents"; or (6) "communicate meaningfully with Petitioner during trial about the progress of the case or elicit potentially helpful input from Petitioner." (Traverse at 4.)

1   Petitioner fails to allege sufficient facts in support of those
2   claims, nor does he explain how the alleged deficient performance
3   prejudiced his defense.  Petitioner's conclusory allegations
4   that his counsel was unprepared for trial are insufficient to
5   warrant habeas relief.  See James, 24 F.3d at 26; Jones v. Gomez,
6   66 F.3d 199, 205 (9th Cir. 1995).
7          2.   *Alleged failure to "present evidence at trial"*
8        Petitioner argues that his attorney was constitutionally
9   ineffective by "failing to seek or produce expert testimony to
10  support Petitioner's consultancy business model."  (Traverse at
11  4, 6.)  Even assuming that an expert was available to support
12  Petitioner's own testimony and that counsel was deficient for not
13  calling him or her, in light of the extensive evidence at trial —
14  including testimony that Petitioner said he would "handle"
15  victims' legal cases, prepare legal documents, and direct the
16  other attorneys, as well as Petitioner's own inability to recall
17  any specific cases in which he was allegedly qualified as an
18  expert — Petitioner cannot show prejudice.  See Martin v. Quinn,
19  472 F. App'x 564, 567 (9th Cir. 2012) (as amended) (counsel not
20  ineffective by failing to call expert to testify regarding how
21  mental illness affected reliability of petitioner's confession
22  because "given the testimony of [petitioner's] stepfather and the
23  two eyewitnesses to the murder, it is not reasonably probable
24  that the jury would have reached a different outcome if
25  [petitioner's] confession had been shown to be unreliable"); see
26  also King v. McDaniel, 357 F. App'x 856, 859 (9th Cir. 2009)
27  (rejecting IAC claim when petitioner failed to demonstrate that
28  prejudice resulted from counsel's failure to call expert

1  witness); <u>Smith v. Schriro</u>, 290 F. App'x 44, 46 (9th Cir. 2008)

2  (same).

3      Although not entirely clear, Petitioner also apparently

4  argues in his Traverse that counsel should have presented

5  evidence that (1) Petitioner's retainer agreements established

6  that he was an expert consultant (Traverse at 8-15); (2) Jeremy

7  and Jonnie Snow never signed a new engagement agreement or paid a

8  fee after Petitioner's December 1, 2000 suspension (<u>id.</u> at 11);

9  (3) Parkkonen was "essentially unrepresented by his own choice"

10 between December 1, 2000, and May 2, 2001 (<u>id.</u> at 12); (3)

11 Petitioner told Thomas and Church that "he was no longer

12 practicing law, and working exclusively as a consultant" (<u>id.</u> at

13 13); (4) Turnbow's fee account was depleted after December 1,

14 2000 (<u>id.</u> at 13-14); (5) Fuentes, after testifying at trial,

15 "approached Petitioner outside the courtroom and asked if

16 Petitioner would continue to assist him with his various domestic

17 relations matters" (<u>id.</u> at 14); and (6) Patrick "worked out an

18 accommodation of his own with the adverse party," then terminated

19 Petitioner (<u>id.</u> at 15).  As discussed in Section V.A.1, however,

20 counsel did present extensive argument and evidence that

21 Petitioner was merely a "consultant" and not holding himself out

22 as entitled to practice law, and Petitioner testified that he did

23 not hold himself out as entitled to practice law.  Moreover, it

24 is not clear how the rest of Petitioner's asserted evidence, if

25 it indeed exists, would have proved that Petitioner did not hold

26 himself out as entitled to practice law.

27      Petitioner further asserts that counsel should have called

28 the district attorney's investigator, Dina Mauger, as his own

witness "to explain her investigative procedures"; called
attorney Schroeter as a witness "to explain his representation of
Seidman"; asked McKeon about the count regarding Jay and Rebecca
Seagrave; and challenged Phillips's testimony, which was
allegedly "highly inaccurate." (Traverse at 7-8, 10, 13.)
Mauger did not testify at the trial, and given that she
apparently investigated Petitioner's crimes on behalf of the
district attorney (Lodged Doc. 1, 1 Clerk's Tr. at 12), it was
reasonable for counsel not to call her as a defense witness
because doing so would pose a substantial risk of backfiring.
See Stanley v. Schriro, 598 F.3d 612, 636 & n.28 (9th Cir. 2010)
("Capable lawyers evaluate not only what they ought to do, but
what they ought not to do. Where action on behalf of a client
has a considerable likelihood of backfiring, they avoid it.");
Brodit v. Cambra, 350 F.3d 985, 992-93 (9th Cir. 2003) (counsel
not ineffective for deciding not to present expert testimony that
would have opened door to damaging rebuttal).

In any event, to the extent Petitioner claims that counsel
was deficient for failing to call certain witnesses, he has
failed to provide sufficient proof that they were available or
would have provided testimony helpful to the defense. See Dows,
211 F.3d at 486 (rejecting IAC claim based on counsel's failure
to interview or call alibi witness, when Petitioner provided "no
evidence that this witness would have provided helpful testimony
for the defense i.e., [he] has not presented an affidavit from
this alleged witness"); Mack v. Sisto, No. CV 09-1638 DSF (FMO),
2012 WL 3018205, at *13 (C.D. Cal. May 9) (IAC claim without
merit when Petitioner "has not presented any competent evidence

1    demonstrating that [potential witness] was available and willing
2    to testify," such as affidavit or declaration), accepted by 2012
3    WL 3018159 (C.D. Cal. July 23, 2012).   Petitioner's self-serving
4    allegations that certain witnesses would have provided helpful
5    information if questioned differently on cross-examination are
6    also insufficient to warrant habeas relief.   See Dows, 211 F.3d
7    at 486-87 (petitioner's "self-serving affidavit" was insufficient
8    evidence of counsel's lack of preparation to prove he was
9    constitutionally ineffective).

10              3.   *Alleged failure to "follow instructions in trial*
11                    *and posttrial proceedings"*

12        Petitioner argues that counsel failed to "follow
13   instructions in trial and post-trial proceedings."   (Pet. at 5.)
14   In his Traverse, Petitioner argues, more specifically, that
15   counsel "failed to argue a 'cruel and unusual punishment' defense
16   as instructed by Petitioner.'"   (Traverse at 5-6, 19-20.)
17   Petitioner's claim fails even on de novo review.

18        The Eighth Amendment contains a "narrow" proportionality
19   principle that forbids only "extreme sentences that are grossly
20   disproportionate to the crime"; it does not require "strict
21   proportionality between crime and sentence."   Graham v. Florida,
22   560 U.S. ___, 130 S. Ct. 2011, 2021, 176 L. Ed. 2d 825 (2010)
23   (quoting Harmelin v. Michigan, 501 U.S. 957, 997, 1000-01, 111 S.
24   Ct. 2680, 2702, 2705, 115 L. Ed. 2d 836 (1991) (Kennedy, J.,
25   concurring in part and concurring in judgment (internal quotation
26   marks omitted))).   It is exceptionally difficult for a criminal
27   to show that his sentence is unconstitutionally disproportionate.
28   See Ewing v. California, 538 U.S. 11, 21, 123 S. Ct. 1179, 1185,

155 L. Ed. 2d 108 (2003) (noting that successful Eighth Amendment challenges in noncapital cases are "exceedingly rare").

Counsel was not constitutionally ineffective for declining to argue that Petitioner's sentence constituted cruel and unusual punishment because that argument was unlikely to succeed. Petitioner's sentence, which ultimately totaled 12 years 8 months in state prison (Lodged Doc. 8, 1 Clerk's Tr. at 298-99; Lodged Doc. 9, 1 Rep.'s Tr. at 8-9), was not one of the "exceedingly rare" cases involving gross disproportionality sufficient to constitute an Eighth Amendment violation. Petitioner was ultimately convicted of 17 counts of felony unlawful practice of law, several of which were committed while he was released on his own recognizance for another felony case. (Lodged Doc. 2, 4 Rep.'s Tr. at 683-84; Lodged Doc. 8, 1 Clerk's Tr. at 239-41.) The court reasonably sentenced Petitioner to the middle term, or two years, for four of those counts, and one-third of the middle term, or eight months, for each of the remaining counts. (Lodged Doc. 2, 4 Rep.'s Tr. at 756-57; Lodged Doc. 8, 1 Clerk's Tr. at 239-41; Lodged Doc. 9, 1 Rep.'s Tr. at 9.) The court also sentenced Petitioner to a mandatory two-year enhancement because he committed many of his crimes while on release after having been charged with another felony. (Id.)

Petitioner's sentence appears particularly reasonable given the circumstances of his crimes. At the initial sentencing, the trial court noted that Petitioner's sentence seemed long when viewed "in a vacuum" but that several factors showed that Petitioner had "earned this term." (Lodged Doc. 2, 4 Rep.'s Tr. at 757.) The court found that Petitioner had "used his skill,

intellect, and abilities to prey on victims who were extremely vulnerable" and that "[t]here are few situations in life where people are as desperate as they are when dealing with child-custody issues." (Id. at 752.)  The court found that Petitioner separated his victims "from over $100,000" but "performed few worthwhile services." (Id.)  Petitioner "held himself out as an expert, yet recommended legal actions that were futile, contrary to the law, and exposed his clients to penal as well as monetary sanctions," and Petitioner's "sole motive for doing so was personal gain." (Id. at 752-53.)  Petitioner also continued to provide legal advice after he was told not to by the state Bar and held to answer on criminal charges. (Id. at 753.)  Moreover, Petitioner "continue[d] to show no empathy or remorse" and a "callous disregard" for the people he victimized. (Id.)

In sum, counsel did not act unreasonably by failing to argue that Petitioner's 12-year, 8-month sentence for 17 counts of unlawful practice of law constituted cruel and unusual punishment.  Indeed, the Supreme Court has upheld far tougher sentences for less serious crimes. See Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (50 years to life under California's three-strikes law for stealing $150 worth of videotapes); Ewing, 538 U.S. at 11 (25 years to life under California's three-strikes law for theft of three golf clubs); Harmelin, 501 U.S. at 957 (life without parole for possessing large quantity of cocaine); Rummel v. Estelle, 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (life with possibility of parole for obtaining money by false pretenses, defendant's third nonviolent felony); Hutto v. Davis, 454 U.S. 370, 102 S. Ct. 703,

1    70 L. Ed. 2d 556 (1982) (40 years for possession of marijuana

2    with intent to distribute and distribution of marijuana). This

3    claim therefore fails even on de novo review.

4              4. *Petitioner's remaining claims*

5       Petitioner alleges that his trial counsel was ineffective by

6    "fail[ing] to communicate an offer of a plea bargain, which

7    Petitioner would have accepted." (Traverse at 5; <u>see also</u> Pet.

8    at 5.) As a general rule, "defense counsel has the duty to

9    communicate formal offers from the prosecution to accept a plea

10   on terms and conditions that may be favorable to the accused."

11   <u>Missouri v. Frye</u>, 566 U.S. ___, 132 S. Ct. 1399, 1408, 182 L. Ed.

12   2d 379 (2012). But although Petitioner briefly asserts in his

13   Traverse that the alleged offer consisted of "two misdemeanors,

14   restitution, and a right of appeal" and that it was "never

15   communicated to Petitioner until after the trial was concluded

16   and Petitioner was incarcerated" (Traverse at 34), he fails to

17   allege any facts about when that offer was allegedly made or how

18   it was eventually communicated to him once he was already in

19   prison. The evidence, moreover, shows that Petitioner knew of

20   and rejected the alleged offer or one that was very similar:

21   during a presentence interview at the Probation Department,

22   Petitioner "report[ed] that he turned down a two-misdemeanor

23   conviction plea and took his chance at a Court trial because he

24   wanted to continue his work as a 'worldwide child custody and

25   divorce expert.'" (Lodged Doc. 1, 4 Clerk's Tr. at 651, 667.)

26   In any event, Petitioner does not cite any record evidence

27   regarding an alleged plea offer that was not communicated, nor

28   does he proffer sworn statements from himself or trial counsel

1  regarding the alleged plea.  Petitioner's bare assertion that an

2  offer was made and not communicated to him, with no supporting

3  facts, is insufficient to warrant habeas relief.  See James, 24

4  F.3d at 26; Jones, 66 F.3d at 205.

5       Even assuming the offer was made and not communicated,

6  moreover, Petitioner has failed to adequately allege that he was

7  prejudiced.  See Frye, 132 S. Ct. at 1409 (to show prejudice from

8  counsel's failure to communicate plea offer, defendants must

9  demonstrate "reasonable probability they would have accepted the

10  earlier plea offer had they been afforded effective assistance of

11  counsel," "reasonable probability the plea would have been

12  entered without the prosecution canceling it or the trial court

13  refusing to accept it," and "reasonable probability that the end

14  result of the criminal process would have been more favorable by

15  reason of a plea to a lesser charge or a sentence of less prison

16  time"); accord Lafler v. Cooper, 566 U.S. ___, 132 S. Ct. 1376,

17  1385, 182 L. Ed. 2d 398 (2012) (to establish prejudice from

18  counsel's ineffective advice regarding plea offer, defendant

19  "must show that but for the ineffective advice of counsel there

20  is a reasonable probability that the plea offer would have been

21  presented to the court (i.e., that the defendant would have

22  accepted the plea and the prosecution would not have withdrawn it

23  in light of intervening circumstances), that the court would have

24  accepted its terms, and that the conviction or sentence, or both,

25  under the offer's terms would have been less severe than under

26  the judgment and sentence that in fact were imposed").  Indeed,

27  given its comments when rendering the verdict and at sentencing,

28  it appears unlikely that the trial court would have accepted a

guilty plea to two misdemeanors.  It also appears that the
prosecution would likely have withdrawn any offer because
evidence showed that Petitioner continued to hold himself out as
entitled to practice law after his arrest and the preliminary
hearing in this case (<u>see, e.g.</u>, Lodged Doc. 1, 2 Clerk's Tr. at
397 (October 2003 order releasing Petitioner on own recognizance
on condition that he dismantle website and remove any internet
reference to phone number and email address); Lodged Doc. 1, 3
Clerk's Tr. at 506 (prosecutor's April 2004 statement at
preliminary hearing that Petitioner had not dismantled websites
listing address, phone number, website, and email address), 517-
18 (May 2004 order revoking Petitioner's own-recognizance status
and conditioning release on bail on his dismantling of website
and internet references to phone number and email address), 617
(August 2005 letter from community member stating that Petitioner
continued to refuse to take down websites); Lodged Doc. 1, 4
Clerk's Tr. at 653 (September 2005 probation and sentence report
noting prosecutor's statement that Petitioner "continued to
practice law after he had been arrested with charges filed and
after the initial Preliminary hearing thereby committing crime-
bail-crime"); Lodged Doc. 2, 4 Rep.'s Tr. at 753 (court's
statement at sentencing that Petitioner "continued to provide
legal advice after he was told not to by the state bar, after he
had been held to answer on criminal charges, and, arguably, after
he was held to answer on additional charges").  The state court
therefore was not objectively unreasonable in denying this claim.

Petitioner also does not allege any facts in support of his
conclusory allegations that counsel was constitutionally

71

1    ineffective by failing to object to "improper evidence," return
2    Petitioner's case file "after representation terminated," or
3    obtain replacement counsel.  (Pet. at 5; Traverse at 5.)  Again,
4    Petitioner's bare assertions, with no supporting facts, are
5    insufficient to warrant habeas relief.  James, 24 F.3d at 26;
6    Jones, 66 F.3d at 205.

7         Finally, in his Traverse, Petitioner argues for the first
8    time that counsel "failed to adequately communicate the substance
9    of various chambers conferences between counsel and the judge
10   before, during, and after trial" and "failed to advise Petitioner
11   about the potential outcome of his trial vis-a-vis an offer of a
12   plea bargain."  (Traverse at 5.)  Because these issues were not
13   raised in the Petition, this Court declines to consider them on
14   habeas review.  Delgadillo, 527 F.3d at 930 n.4 (holding that
15   reply is not proper pleading to raise additional grounds for
16   relief or amend petition); Cacoperdo v. Demosthenes, 37 F.3d 504,
17   507 (9th Cir. 1994) (same).

18        B.   Appellate Counsel
19        Petitioner alleges that appellate counsel was ineffective by
20   "fail[ing] to raise all issues on appeal" and "refus[ing] to file
21   habeas corpus petitions."  (Pet. at 5.)

22        Appellate counsel properly may decline to raise an argument
23   on appeal because he foresees little or no likelihood of success
24   on that claim.  Smith v. Robbins, 528 U.S. 259, 288, 120 S. Ct.
25   746, 765, 145 L. Ed. 2d 756 (2000).  Thus, an "appellate
26   counsel's failure to raise issues on direct appeal does not
27   constitute ineffective assistance when appeal would not have
28   provided grounds for reversal."  Wildman v. Johnson, 261 F.3d

1    832, 840 (9th Cir. 2001).  The state courts' denial of this claim

2    was not objectively unreasonable because none of the claims

3    Petitioner has raised are meritorious, and therefore appellate

4    counsel's failure to raise them on appeal could not have been

5    ineffective assistance.  Further, appellate counsel was not

6    ineffective for failing to raise on direct appeal claims

7    asserting ineffectiveness of Petitioner's trial counsel because

8    California law dictates that those claims generally are "more

9    appropriately litigated in a habeas corpus proceeding."  <u>People</u>

10   <u>v. Mendoza Tello</u>, 15 Cal. 4th 264, 266-67, 62 Cal. Rptr. 2d 437,

11   438 (1997).  Accordingly, this claim fails on independent review.

12       Petitioner's claim that appellate counsel was ineffective by

13   "refusing to file habeas corpus petitions" also fails.  (Pet. at

14   5.)  Although there is a right to counsel on direct appeal, there

15   is no right to counsel in a habeas proceeding.  <u>Coleman</u>, 501 U.S.

16   at 753 ("[T]here is no constitutional right to an attorney in

17   state postconviction proceedings.");  <u>Pennsylvania v. Finley</u>, 481

18   U.S. 551, 555, 107 S. Ct. 1990, 1993, 95 L. Ed. 2d 539 (1987)

19   (prisoners' right to appointed counsel does not extend to

20   "collateral attacks upon their convictions").  Thus, "a

21   petitioner cannot claim constitutionally ineffective assistance

22   of counsel in such proceedings."  <u>Coleman</u>, 501 U.S. at 752; <u>see</u>

23   <u>also</u> <u>Bonin v. Calderon</u>, 77 F.3d 1155, 1159-60 (9th Cir. 1996).

24       Petitioner is not entitled to habeas relief on this ground.

25   **VI.** **<u>Petitioner's request for appointment of counsel and an</u>**

26       **<u>evidentiary hearing are denied</u>**

27       Petitioner requests an evidentiary hearing and appointment

28   of counsel.  (Traverse at 2.)  The interests of justice do not

1  require appointment of counsel at this late stage of the
2  proceedings, particularly given that Petitioner is a trained
3  former attorney.  See Weygandt v. Look, 718 F.2d 952, 954 (9th
4  Cir. 1983).  Thus, his request is denied.

5      Moreover, an evidentiary hearing is not authorized on issues
6  that can be resolved by reference to the state-court record under
7  § 2254(d)(1), as five subclaims of ground one and all of grounds
8  three, four, five, and six can.  Cullen v. Pinholster, 563 U.S.
9  ___, 131 S. Ct. 1388, 1399, 179 L. Ed. 2d 557 (2011).  Pinholster
10  limits federal habeas review under § 2254(d)(1) to evidence
11  introduced before the state court.  Id. at 1398-1401.

12      With respect to the four remaining subclaims of ground one,
13  which the Court has reviewed de novo, an evidentiary hearing is
14  also not warranted.  Further factual development is not warranted
15  on Petitioner's claim that appellate counsel was ineffective by
16  refusing to file habeas petitions because it is barred as a
17  matter of law, so no further factual development is needed.  See
18  Coleman, 501 U.S. at 752.  As to his other claims — that trial
19  counsel was constitutionally ineffective by failing to follow
20  instructions, return Petitioner's case file, or obtain
21  replacement counsel — Petitioner fails to specify what helpful
22  evidence could be adduced at an evidentiary hearing.  Thus, his
23  request for an evidentiary hearing is denied.  See also Schriro
24  v. Landrigan, 550 U.S. 465, 474, 127 S. Ct. 1933, 1940, 167 L.
25  Ed. 2d 836 (2007) ("[I]f the record refutes the applicant's
26  factual allegations or otherwise precludes habeas relief, a
27  district court is not required to hold an evidentiary hearing.").
28

1

**ORDER**

2      IT THEREFORE IS ORDERED that Judgment be entered denying the

3  Petition and dismissing this action with prejudice.

4

5  DATED: November 28, 2012

6                                    JEAN ROSENBLUTH
                                     U.S. MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28